F I L E D

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

NOV 2 3 2004

KENNETH S. GARDNER, CLERK
PS REP. - DDS

not-mot DIP financing cash collateral 11-22-04

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | **Chapter 11** |
| | ) | |
| **SUBURBAN DODGE OF** | ) | **Case No.  04 B 42931** |
| **BERWYN, INC.** D/B/A **SUBURBAN** | ) | |
| **DODGE-ISUZU-SUZUKI, AN ILLINOIS** | ) | **Hon. Eugene R. Wedoff** |
| **CORPORATION,** | ) | |
| | ) | **Date:  November 24, 2004** |
| **Debtor.** | ) | **Time:  10:00 a.m.** |

### NOTICE OF MOTION PRESENTED AS AN EMERGENCY MATTER

TO:   SEE ATTACHED SERVICE LIST

**PLEASE TAKE NOTICE** that on November 24, 2004 at 10:00 a.m. or as soon thereafter as counsel may be heard, we shall appear before the Honorable Eugene R. Wedoff, Chief Bankruptcy Judge, presiding in the room usually occupied by him as Courtroom 744, in the U.S. Courthouse, 219 South Dearborn Street, Chicago, Illinois, or in his absence, before such other Judge who may be sitting in his place and stead, and shall then and there present the **MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING USE OF CASH COLLATERAL AND DEBTOR IN POSSESSION FINANCING,** a copy of which is hereto attached and served upon you.

This motion shall be presented as an Emergency Matter pursuant to Local Bankruptcy Rule 5096-1.

GESAS, PILATI, GESAS AND GOLIN, LTD.
53 West Jackson Boulevard, Suite 528
Chicago, Illinois 60604
(312) 726-3100

### CERTIFICATE OF SERVICE

I, David A. Golin, the undersigned attorney, certify that I caused a copy of the foregoing Notice and attached Motion to be served upon all parties listed on the attached Service List by facsimile transmission ("fax") to each such person as set forth on the Service List at their respective fax numbers on the 23rd day of November, 2004.

David A. Golin

## SERVICE LIST

### *In re Suburban Dodge of Berwyn, Inc. d/b/a Suburban Dodge-Isuzu-Suzuki, Debtor*
### No. 04 B 42931

Stephen G. Wolfe
Office of the United States Trustee
227 West Monroe Street, Suite 3350
Chicago, IL 60606
*Counsel for United States Trustee*
Fax: (312) 886-5794

Barry A. Chatz
Arnstein & Lehr LLP
120 South Riverside Plaza, Suite 1200
Chicago, IL 60606-3910
*Counsel for Daimler Chrysler Services*
*North America LLC*
Fax: (312) 876-0288

Mark V. Bossi
Brian Hockett
Thompson Coburn LLP
One U.S. Bank Plaza
St. Louis, MO 63101
*Counsel for Daimler Chrysler Services*
*North America LLC*
Fax: (314) 552-7015

Kathleen Field Orr
Kathleen Field Orr & Associates
One South Wacker Drive
Suite 1990
Chicago, IL 60606
*Counsel for Village of Berwyn*
Fax: (312) 382-2124

Suburban Dodge of Berwyn, Inc.
7050 West Ogden Avenue
Berwyn, IL 60402
Fax: (708) 484-4177

AmeriMark Bank
5456 S. LaGrange Road
Countryside, IL 60525
Fax: (708) 579-4313

American Express Business Finance
Corporation
1851 East First Street, Suite 600
Santa Ana, CA 92705
Fax: (714) 547-7236

ADP Leasing
99 Jefferson Road
Parsippany, NH 07054
Fax: (516) 694-0239

Reyna Capital Corp.
P.O. Box 2608
Dayton, OH 45401
Fax: (937) 485-4718

District Counsel for Internal Revenue
Service
200 W. Adams St., Suite 2300
Chicago, IL 60606
Fax: (312) 886-9244

ADP Dealer Services
P.O. Box 88921
Chicago, IL 60695
Fax: (847) 397-9150

Arcadia Financial
P.O. Box 8021
South Hackensac, NJ 07606
Fax: (817) 835-3987

Baltimore Life
9699 Tierra Grande
San Diego, CA 92126
Fax: (858) 689-2449

GMAC
P.O. Box 9001952
Louisville, KY 40290
Fax: (708) 873-4977

GMAC
15303 94th Avenue
Orland Park, IL 60462
Fax: (708) 873-4977

Gabriel Environmental
1421 N. Elston Avenue
Chicago, IL 60622
Fax: (773) 486-0004

James J. Roche & Associates
Attorneys at Law
642 North Dearborn
Chicago, IL 60610
Fax: (312) 335-9009

Liberty Mutual Insurance Group
75 Remittance Drive, Suite 1837
Chicago, IL 60675-1837
Fax: (309) 685-3108

Lyndon Properties & The Plan & Prizm
1099 18th Street
Denver, CO 80202-1940
Fax: (313) 467-8668

MC2 Customs Alloy, Inc.
P.O. Box 72971
Los Angeles, CA 90084
Fax: (562) 220-2872

Man Marketing, Inc.
765 Kimberly Drive
Carol Stream, IL 60188
Fax: (630) 752-9288

McHenry Insurance Services
904 S. Rt. 31
McHenry, IL 60051
Fax: (815) 385-8727

National Credit Center, Inc.
2605 Camino Del Rio South, #400
San Diego, CA 92108
Fax: (877) 709-7222

Harris Bank
3800 Golf Road, #300
Rolling Meadows, IL 60008
Fax: (847) 434-2586

Harris Bank Barrington NA
201 South Grove Avenue
Barrington, IL 60010
Fax: (847) 434-2584

David B. Sosin
Sosin, Lawler, & Arnold, LLC
11800 S. 75th Avenue, Suite 300
Palos Heights, IL 60463
Fax: (708) 448-8140

Suburban Auto
3143 S. Austin Blvd.
Cicero, IL 60804
Fax: (708) 652-4603

Traid Financial
5201 Fufe Snow North Richland Hills, TX
76180
Fax: (817) 605-6502

United Auto
1055 W. 175th
Homewood, IL 60430
Fax: (708) 647-0003

Weis & Dubrock
One North LaSalle Street
Suite 1300
Chicago, IL 60602
Fax: (312) 372-8343

mot-DIP financing cash collateral 11-22-04

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FILED

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

NOV 23 2004

KENNETH S. GARDNER, CLERK
PS REP. - DDS

| | | |
|---|---|---|
| **In re** | ) | **Chapter 11** |
| | ) | |
| **SUBURBAN DODGE OF** | ) | Case No. 04 B 42931 |
| **BERWYN, INC. D/B/A SUBURBAN** | ) | |
| **DODGE-ISUZU-SUZUKI, AN ILLINOIS** | ) | **Hon. Eugene R. Wedoff** |
| **CORPORATION,** | ) | |
| | ) | **Date: November 24, 2004** |
| **Debtor.** | ) | **Time: 10:00 a.m.** |

## MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING USE OF CASH COLLATERAL AND DEBTOR IN POSSESSION FINANCING

Suburban Dodge of Berwyn, Inc. d/b/a Suburban Dodge-Isuzu-Suzuki, an Illinois Corporation, debtor and debtor in possession ("Debtor"), by its attorneys, pursuant to 11 U.S.C. §§ 105, 362, 363 and 364 and Rule 4001 of the Federal Rules of Bankruptcy Procedure, respectfully requests that this Court enter an interim order and after further notice and hearing a final order: (a) authorizing Debtor's use of the cash collateral of Daimler Chrysler Services North America LLC ("DCSNA"), (b) authorizing Debtor to obtain debtor in possession financing from DCSNA to finance trade in vehicles, and (c) granting DCSNA adequate protection for Debtor's use of cash collateral and its debtor in possession financing. In support of this Motion, Debtor states as follows:

### Introduction

1.      On November 18, 2004, Debtor filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Code").

2.      Pursuant to the provisions of sections 1107 and 1108 of the Code, Debtor remains in possession of its assets and is authorized to operate its business and manage its affairs as a debtor in possession.

3.    No creditors' committee has yet been appointed in these cases. No trustee or examiner has been appointed.

4.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5.    The statutory predicates for the relief requested herein are sections 105, 362, 363, 364, 1107 and 1108 of the Code.

**Debtor's Business Operations**

6.    Debtor is an automobile dealership in the business of selling new and used vehicles and vehicle parts and accessories and providing repair and maintenance service.

**Pre-Petition DCSNA Financing**

7.    DCSNA provided wholesale floor plan financing to Debtor whereby DCSNA financed and Debtor acquired virtually all of its inventory of motor vehicles and parts. The wholesale floor plan financing was provided pursuant to various financing agreements including, without limitation, that certain Master Loan and Security Agreement dated February 8, 2002 (the "MLSA").

8.    DCSNA provided capital financing to Debtor whereby DCSNA provided funds for the operation of the Debtor's automobile dealership. The capital financing was provided pursuant to various financing agreements including that certain Capital Loan Addendum to Master Loan and Security agreement dated February 8, 2002, and that certain Capital Note date January 23, 2004, and that certain Addendum to Capital Note dated January 23, 2004 (collectively, the "Capital Loan Documents").

9.    The financing agreements, including, without limitation, the MLSA and the Capital Loan Documents, are referred to collectively herein as the "Loan and Security

2

Documents". Under the terms of these Loan and Security Documents, DCSNA has acquired a security interest in the Collateral. Copies of the Loan and Security Documents are attached hereto collectively as Exhibit A.[1]

10.     DCSNA perfected its security interest by making all appropriate filings with the Secretary of State of the State of Illinois. Copies of said financing statements are attached hereto collectively as Exhibit B.[2]

11.     As of the Petition Date, Debtor owed DCSNA a total of $5,980,101.23 representing $4,429,166.23 for new motor vehicle financing; $722,185.00 in used motor vehicle financing; $828,750.00 in capital financing (the "Existing Indebtedness").

**Debtor's Need for Use of Cash Collateral**

12.     Without the continued use of DCSNA's cash collateral, Debtor would be unable to continue operations. Debtor's financial condition is such that it cannot continue to operate long-term. Debtor intends to sell virtually all of its assets, subject to Court approval, on an expedited basis.

13.     Section 363(c)(2) of the Code enables a debtor in possession to use cash collateral only if an entity with an interest in such cash collateral consents, or the court authorizes such use.

14.     DCSNA has agreed to permit Debtor to use cash collateral, for a period of sixty days (through January 18, 2004) in accordance with a budget (the "Budget"), on a limited basis, upon certain terms and conditions, including the provision of adequate protection. Accordingly, Debtor and DCSNA wish to establish the basis upon which Debtor may:

(i)      Use cash collateral of DCSNA;

---

[1] The Loan and Security Documents are voluminous and for that reason have been attached only to the original and copies of this motion filed with the Court.

[2] The Financing Statements are voluminous and for that reason have been attached only to the original and copies of this motion filed with the Court.

    (ii)    Sell in the ordinary course of business certain inventory in which DCSNA

holds a perfected security interest;

    (iii)   Segregate, sequester and pay over to DCSNA the net proceeds of

DCSNA's cash collateral; and

    (iv)   provide for adequate protection of DCSNA's security interest in the

collateral used by Debtor.

### Debtor's Need for DIP Financing

15.    DCSNA has also agreed, at its option, to provide debtor in possession financing

for the purpose of financing a trade in vehicle or a special order. No debtor in possession

financing for Debtor's purchase of new vehicles is being requested.

### The Interim Order

16.    A proposed Interim Order Authorizing Use of Cash Collateral and Debtor in

Possession Financing (the "Interim Order") is attached hereto as Exhibit C.

17.    By this Motion, Debtor requests the immediate entry of the Interim Order. Debtor

further requests that this Court set a final hearing on the Motion, pursuant to Rule 4001(c) of the

Bankruptcy Rules, for entry of a Final Order Authorizing Use of Cash Collateral and Debtor in

Possession Financing (the "Final Order").

18.    The only provisions set forth in Local Rule 4001-2(A)(2) that are contained in the

Interim Order are the type in subparagraph (i):

    (i)    provisions that grant lender expedited relief from the automatic stay in
    § 362 of the Bankruptcy Code or relief from the automatic stay without
    further order of the Court (See paragraph 11 of the Interim Order).

The Interim Order provides in paragraph 11:

    DCSNA may file and serve Debtor and counsel for Debtor, via fax, with a
Declaration of Default and a proposed *ex parte* Order for Relief from the Automatic Stay,
Debtor shall have three (3) business days from the date counsel for Debtor is served via
fax, with the Declaration of Default, in which to file and serve counsel for DCSNA, via

4

fax, with a Declaration to the effect that Debtor was not in default or that Debtor cured the default within three (3) business days of service of Notice of Default. Said Declaration shall include documentary evidence, establishing or tending to establish that Debtor was not in default, or that Debtor cured the default within three (3) business days of service of the Notice of Default. If Debtor fails to file such a Declaration, the Court shall sign the *ex parte* order for Relief from Stay without further notice of Court proceedings. If Debtor does file a Declaration to the effect that Debtor was not in default or that Debtor cured the default within a timely fashion, then there shall be a hearing on twenty-four (24) hour notice. At such hearing, relief from the Automatic Stay shall be granted to DCSNA unless Debtor establishes that it was not in default or that Debtor cured the default within three (3) business days of service, via fax, of the declaration of default as provided above.

DCSNA has advised Debtor that such provisions are necessary due to Debtor's past payment

history.

19.    In the Interim Order, Debtor and DCSNA have stipulated as to several matters.

Two of these matters relate to provisions of the type in subparagraphs (b) and (c) in Local Rule

4001-2(A)(2), namely that:

- The claims of DCSNA for Existing Indebtedness are secured claims within the meaning of 11 U.S.C. § 506 to the extent of principal, interest thereon at the rate set forth in the existing loan documents, costs, attorneys fees, and out-of-pocket expenses incurred and to be incurred by DCSNA in connection with this case. (See paragraph K of the Interim Order)

- No cash collateral or other collateral of DCSNA may be used to pay, or be charged pursuant to section 506(c) of the Bankruptcy Code or other applicable law, for any costs or expense of preserving or disposing of any of DCSNA's Collateral, or for any expenses of administration of the case. The provisions of this paragraph shall not apply to any subsequently appointed Chapter 11 Trustee or Chapter 7 Trustee as to any period of time after which the Debtor is prohibited from using cash collateral. (See paragraph L of the Interim Order)

20.    The Interim Order contains, *inter alia*, the following additional provisions:

- Debtor shall establish a new cash collateral account.

- Debtor shall deposit all proceeds of the sale of a motor vehicle into the account.

- Debtor shall pay to DCSNA the amount financed on the vehicle.

- Upon payment to DCSNA, Debtor may use balance of sale proceeds for the purposes and in the amounts set forth in the Budget.

- If Debtor accepts a trade-in as part of the sale of a vehicle, DCSNA shall be granted a lien pursuant to 11 U.S.C. § 364(c) and 11 U.S.C. § 507(b) on any such trade-in vehicle, and, at DCSNA's option, DCSNA may finance any trade-in vehicle, if requested to do so by Debtor.

- Various terms and conditions for fleet sales, dealer trades/sales and/or auto broker sales.

- Various terms and conditions for wholesale or auction sales.

- Various terms and conditions for sale of automotive parts.

- Milestones for the sale of substantially all of Debtor's assets (dates to be filled in.)

- As Adequate protection for Debtor's use of cash collateral, DCSNA is granted (i) liens and security interests junior to properly perfected liens and security interests in all pre-petition assets of the Debtor, (ii) liens and security interests junior to properly perfected liens and security interests in all pre-petition assets of the Debtor, and (iii) claims entitled to priority over any and all administrative expense claims of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code except that such claim shall be subject to all costs and expenses permitted under 28 U.S.C. § 1930. Said liens and security interests shall be valid, perfected, enforceable and effective as of the Petition Date without any further action by Debtor or DCSNA.

- Neither Debtor nor Debtor's principals shall file or allow to be filed a motion under section 364(d) of the Code or other applicable law, seeking to obtain credit or incur debt secured by a senior or equal lien on DCSNA's collateral.

- Debtor shall be deemed to be in default if Debtor fails to comply with any of the terms and conditions of the Interim Order. In the event of a default, counsel for DCSNA shall notify, via fax, Debtor and its counsel, and if the default is not cured within one business day, Debtor's use of cash collateral shall be suspended and DCSNA may proceed to obtain expedited relief from the stay.

## Final Order

21.     In the Final Order, all items stipulated by Debtor and DCSNA in the Interim Order shall be set forth as findings of fact by the Court. In all other material respects, the Final Order shall be the same as the Interim Order.

22.     The Debtor believes that the terms and provisions of the Interim Order and Final Order are the best that the Debtor can obtain under the circumstances. The Debtor believes that its use of cash collateral, authorized by the Interim Order and Final Order, will enable it to, among other things, (a) avoid the cessation of its operations as active going concerns, (b) maintain the continuity and stability of its business operations pending a sale and to provide appropriate assurances of that to vendors and customers, and (c) maximize the value of its business and properties.

23.     Accordingly, Debtor believes that granting this Motion is in the best interests of its estate, creditors and all other parties with a stake in the outcome of this case.

24.     Bankruptcy Rule 4001(b) governs the procedures for obtaining authorization to use cash collateral and provides, in relevant part: The Court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

25.     Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part: The Court may commence a final hearing on a motion for authority to obtain credit no earlier that 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period

7

expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid

immediate and irreparable harm to the estate pending a final hearing.

26.     If the Debtor's access to cash is discontinued, its operations will cease, it will be

unable to pay operating expenses and operate its business in an orderly manner, thereby severely

impairing the value of its assets and its ability to effectuate a going concern sale.

27.     Accordingly, Debtor believes that it and its estate will suffer immediate and

irreparable harm unless it is immediately authorized to use cash collateral and obtain credit, if

necessary, on terms and conditions set forth in the Interim Order.

## Notice With Respect to Interim Order

28.     One days' notice of this Motion, along with a copy of the proposed Interim Order,

has been given by messenger delivery or facsimile transmission to (i) the United States Trustee

for the Northern District of Illinois, (ii) counsel to DCSNA, (iii) Debtor's known secured

creditors, (iv) District Counsel for the Internal Revenue Service and (v) the Debtor's 20 largest

unsecured creditors.

29.     Debtor submits that under the circumstances, no further notice of the hearing on

the Interim Order is necessary and requests that any further notice be dispensed with and waived.

## Notice with Respect to Final Order

30.     Debtor requests that it be authorized to serve: (a) a copy of the signed Interim

Order, (b) a copy of the proposed Final Order, and (c) a Notice of the final hearing and the date

for filing objections, if any, mail upon (i) the United States Trustee; (ii) DCSNA and its counsel;

(iii) those persons who have requested notice in this Case, (iv) the District Counsel for the

Internal Revenue Service, and (v) the Debtor's 20 largest unsecured creditors.  The Debtor shall

serve such papers by overnight mail at least 15 days prior to the hearing.  The Debtor further

requests that the Court consider such notice of the final hearing to be sufficient notice under

Bankruptcy Rule 4001.

WHEREFORE, the Debtor respectfully requests that the Court grant the relief as

requested above.

SUBURBAN DODGE OF BERWYN, INC.
D/B/A SUBURBAN DODGE-ISUZU-
SUZUKI, DEBTOR IN POSSESSION


By: _____
                One of Its Attorneys

MICHAEL L. GESAS (06186924)
DAVID A. GOLIN (06180517)
GESAS, PILATI, GESAS AND GOLIN, LTD.
53 West Jackson Boulevard, Suite 528
Chicago, IL  60604
(312) 726-3100

A

CHRYSLER FINANCIAL

## NOTICE OF ASSIGNMENT
### (Factory Credits and Other Payments)

| LOAN NO. | | DEALER NO. |
|---|---|---|
| | | 44028 |

**To:**  American Suzuki Motor Corporation
3251 East Imperial Highway
Brea, CA 92822-1100

**Date:** 2/8/04

**From:**  Suburban Dodge of Berwyn, Inc.
7050 W Ogden Ave.
Berwyn, IL 60402

Please be advised that we have granted a security interest in favor of DaimlerChrysler Services North America LLC, and its successors and assigns ("Chrysler Financial") in our inventory, equipment and other collateral, including any rights that we may have to receive incentive payments and credits from you in any form (including what are commonly referred to as "factory credits").

Under our agreement with Chrysler Financial, we have the continuing right to receive payments and credits from you until such time as Chrysler Financial instructs you to make payments directly to Chrysler Financial. We authorize and direct you to follow Chrysler Financial's instructions to this effect.

We further request and provide you with permission to respond to any inquiries that you may receive from Chrysler Financial with respect to us, our accounts including payment history, our purchase of vehicles and other inventory from you, our reported sales of vehicles and other inventory, any defaults under any obligation or agreement we may have with you and any additional information or comments that you may have. We waive any rights of privacy and confidentiality that we may have with respect to information and comments that you may provide to Chrysler Financial, and we release and relieve you and your employees and agents from any and all liability in this regard.

Please sign the following Acknowledgment and return this form to Chrysler Financial at the below address.

| DEALER NAME: Suburban Dodge of Berwyn, Inc. | ADDRESS: 7050 W Ogden Ave |
|---|---|
| BY: | |
| NAME: | Berwyn, IL 60402 |
| ITS: | |

### ACKNOWLEDGMENT
### AGREED AND ACCEPTED

| MANUFACTURER/DISTRIBUTOR/SUPPLIER: | ADDRESS: |
|---|---|
| BY: | |
| NAME: | |
| ITS: | |

Please sign and return this form to Chrysler Financial at  901 Warrenville Rd Suite 500

Lisle, IL 60532

84-291-7249 (12/01)

JF (9/01)

## EXHIBIT A

# CHRYSLER FINANCIAL

## NOTICE OF ASSIGNMENT
### (Factory Credits and Other Payments)

| LOAN NO. | | DEALER NO. |
|---|---|---|
| | | 44028 |

**To:** American Isuzu Motors Inc.
13340 183rd Street
Cerritos, CA 90703

**Date:** 2/8/02

**From:** Suburban Dodge of Berwyn, Inc.
7050 W Ogden Ave.
Berwyn, IL 60402

Please be advised that we have granted a security interest in favor of DaimlerChrysler Services North America LLC, and its successors and assigns ("Chrysler Financial") in our inventory, equipment and other collateral, including any rights that we may have to receive incentive payments and credits from you in any form (including what are commonly referred to as "factory credits").

Under our agreement with Chrysler Financial, we have the continuing right to receive payments and credits from you until such time as Chrysler Financial instructs you to make payments directly to Chrysler Financial. We authorize and direct you to follow Chrysler Financial's instructions to this effect.

We further request and provide you with permission to respond to any inquiries that you may receive from Chrysler Financial with respect to us, our accounts including payment history, our purchase of vehicles and other inventory from you, our reported sales of vehicles and other inventory, any defaults under any obligation or agreement we may have with you and any additional information or comments that you may have. We waive any rights of privacy and confidentiality that we may have with respect to information and comments that you may provide to Chrysler Financial, and we release and relieve you and your employees and agents from any and all liability in this regard.

Please sign the following Acknowledgment and return this form to Chrysler Financial at the below address.

| DEALER NAME: | ADDRESS: |
|---|---|
| Suburban Dodge of Berwyn, Inc | 7050 W Ogden Ave |
| BY: | |
| NAME: | Berwyn, IL 60402 |
| ITS: | |

### ACKNOWLEDGMENT
### AGREED AND ACCEPTED

| MANUFACTURER/DISTRIBUTOR/SUPPLIER: | ADDRESS: |
|---|---|
| BY: | |
| NAME: | |
| ITS: | |

Please sign and return this form to Chrysler Financial at _____

JF (9/01)

CHECK
CONTROL NO.    34576

SUBURBAN DODGE OF BERWYN, INC.
BERWYN, IL 60402

PAGE 1

| INVOICE STOCK NO. | INVOICE DATE | PURCHASE ORDER NO. | COMMENT/V.I.N. | AMOUNT | DISCOUNT/ ACCOUNT NO. | NET AMOUNT |
|---|---|---|---|---|---|---|
| | 051498 | | | | | |
| | | | | 34576 | 10303 | ~1.0 |
| | | | | 1 | 11100 | 1.0 |
| | | | | TOTAL | 10303 | 1.0C |

DETACH AT PERFORATION BEFORE DEPOSITING CHECK

REMITTANCE ADVICE

THE BACK OF THIS CHECK CONTAINS AN ARTIFICIAL WATERMARK – HOLD AT AN ANGLE TO VIEW

**SUBURBAN DODGE OF BERWYN**

7050 Ogden Avenue
Berwyn, Illinois 60402
(708) 484-1200
Fax (708) 484-6177

HARRIS BANK
Berwyn, IL 60402

034576

34576    2-2566/710

DATE
14MAY98

PAY THIS AMOUNT
***********1    DOLLARS    00    CENTS

AMOUNT OF CHECK
**********1.00

TO THE ORDER OF    CHRYSLER

VOID

SUBURBAN DODGE OF BERWYN, INC.

BY _____

BY _____
AUTHORIZED REPRESENTATIVE

⑈034576⑈ ⑈071025661⑈ 850123211⑈

CHRYSLER FINANCIAL

## SPECIAL POWER OF ATTORNEY
### Wholesale and DRAC

| LOAN NO. | | DEALER NO.|
|---|---|---|
| | | 44028 |

Borrower:
Suburban Dodge of Berwyn, Inc.
7050 W Ogden Ave.
Berwyn, IL 60402

Lender: DaimlerChrysler Services North America LLC

Date: 2/8/02

And All Additional Borrowers Borrowing from Lender

This Special Power of Attorney is executed pursuant to, and supplements, a certain Master Loan and Security Agreement or DRAC Master Loan and Security Agreement, as applicable (the "Agreement") dated the above date between DaimlerChrysler Services North America LLC, as Lender, and the above-named entity, as Borrower as well as all additional Borrowers obtaining loans from Lender pursuant to the Agreement. Each Borrower specifically agrees as follows:

POWER OF ATTORNEY. Borrower irrevocably appoints Lender as its true and lawful attorney-in-fact, coupled with an interest, and with full power of substitution, for the purposes of accomplishing any and all of the following actions: (a) to file, and to the extent necessary, to sign Borrower's name on, any financing or continuation statement, or other documents that are necessary and proper to perfect, continue perfection, amend, or release Lender's security rights and interests; (b) to sign Borrower's name on any and all agreements or documents that are necessary and proper to carry out and enforce Lender's security rights and interests; (c) to notify manufacturers, distributors and suppliers of Borrower's Inventory and Equipment that they are authorized to accept payment from Lender for Inventory and Equipment that Lender may finance pursuant to the Agreement; (d) to sign Borrower's name on any motor vehicle bill of sale, or certificate of title or registration, or application or form submitted to a public agency; (e) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now and in the future become due, owing or payable from the Collateral; (f) to execute, sign and endorse Borrower's name to any and all claims, instruments, receipts, checks, drafts or warrants; (g) to settle or compromise any and all claims arising under the Collateral, and in Borrower's name and place, to execute and deliver a release and settlement for the claim; (h) to file any claim or claims or to take any action or institute or take part in any proceeding, either in Lender's own name or in Borrower's name; (i) to sign Borrower's name to any waiver of landlord's lien, and in Borrower's name, place and stead, to notify and obtain waivers of any landlord's lien with respect to any facility leased or rented by Borrower, or in or at which any of the Collateral may be kept or stored; (j) to sign Borrower's name to any notice of assignment of deposit accounts, and in Borrower's name, place and stead, to notify and obtain the concurrence of Borrower's depository bank; (k) to sign Borrower's name to any notice of assignment of factory credits and other payments, and in Borrower's name, place and stead, to notify and obtain the concurrence of manufacturers, distributors, and suppliers of Borrower's Inventory, Equipment and other Collateral; and (l) in Borrower's name, place and stead, to perform such acts as may be required of Borrower under the Agreement or under any Related Document, but which Borrower may not fully, or may refuse to perform for any or no reason, or that Borrower may delay in performing. Lender may take any and all of the above actions as Lender may deem to be necessary and proper within Lender's sole and exclusive discretion, and without any obligation to do so, at any time and from time to time while the Agreement remains in effect. This special power of attorney is given as security for Borrower's Loans and Obligations, and the authority conferred on Lender is irrevocable and will remain in full force and effect until renounced by Lender in writing.

DEFINITIONS. All definitions set forth in the Agreement shall apply under this Special Power of Attorney.

SUPPLEMENT TO THE AGREEMENT. This Special Power of Attorney supplements the Agreement between Lender and Borrower, and for all purposes is to be considered a part of the Agreement. All provisions of the Agreement remain in full force and effect, and are not affected by this Special Power of Attorney.

84-291-7261 (12/01)   Page 1 of 2

| BORROWER | | | | BORROWER | | | |
|---|---|---|---|---|---|---|---|
| Suburban Dodge of Berwyn, Inc. | | | | | | | |
| ENTITY TYPE | | STATE OF ORGANIZATION | | ENTITY TYPE | | STATE OF ORGANIZATION | |
| Corporation | | Illinois | | | | | |
| BY | | | | BY | | | |
| NAME | | | | NAME | | | |
| ADDRESS | | | | ADDRESS | | | |
| CITY | STATE | ZIP | | CITY | STATE | ZIP | |

| BORROWER | | | | BORROWER | | | |
|---|---|---|---|---|---|---|---|
| ENTITY TYPE | | STATE OF ORGANIZATION | | ENTITY TYPE | | STATE OF ORGANIZATION | |
| BY | | | | BY | | | |
| NAME | | | | NAME | | | |
| ADDRESS | | | | ADDRESS | | | |
| CITY | STATE | ZIP | | CITY | STATE | ZIP | |

Recommended in Alabama, Alaska, Arizona, District of Columbia, Florida, Georgia, Indiana, Kansas, Minnesota, Missouri, Montana, New York, North Carolina, Oregon, Puerto Rico, South Carolina, Tennessee, Utah, West Virginia and Wyoming.

## NOTARIAL AFFIDAVIT

STATE OF _____     COUNTY OF _____

I, the undersigned Notary Public, hereby affirm that the above personally appeared before me and attested that he/she executed the foregoing Special Power of Attorney as the proper and duly authorized representative(s) of Dealer.

SWORN TO AND SUBSCRIBED                          A Notary Public duly commissioned and qualified for the State

this _____ day of _____     of _____ County of _____

_____          My commission expires: _____
NAME

# CHRYSLER FINANCIAL

## RETAIL INSTALLMENT CONTRACT AND LEASE PROGRAM AGREEMENT

Dealer: Suburban Dodge of Berwyn, Inc.
7050 W Ogden Ave.
Berwyn, IL 60402

DaimlerChrysler Services North America LLC ("CF")

Date: 2/8/02

---

**FOR GOOD AND VALUABLE CONSIDERATION RECEIVED,** the parties to this Agreement agree as follows:

**THE PROGRAM.** Dealer has requested CF to establish a program (the "Program") under which CF will, from time to time, one or more times, offer to purchase leases and/or credit sales contracts ("Contracts") originated by Dealer as lessor or as seller/creditor, that involve the lease or credit sale of motor vehicles ("Vehicles") to Dealer's customers ("Customers"). CF has agreed to establish the Program and to offer to purchase Contracts from Dealer on a recurring basis.

**Program Purchases.** All Program purchases shall be made pursuant to the terms and conditions of this Agreement. Each Contract shall initially constitute a direct payment obligation of the Customer to and in favor of Dealer, which upon purchase will be assigned to CF.

**Leases of Vehicles.** All leases of Vehicles under Contracts purchased by CF ("Leases") shall be in the ordinary course of Dealer's business. The agreed-upon value of each leased Vehicle shall not exceed the cash price for which Dealer otherwise would have agreed to sell the same Vehicle to an ordinary retail purchaser. A Contract may not provide for maintenance, insurance or other services by or at the expense of Dealer unless separate identifiable charges therefor are included in the Contract. Once a Contract is purchased by and assigned to CF, Dealer shall cease for all purposes to have any rights to or interest in the Lease and in the leased Vehicle, which shall be titled in CF's name.

**Credit Sales of Vehicles.** All credit sales of Vehicles under Contracts purchased by CF shall be in the ordinary course of Dealer's business. The sales price of each Vehicle shall not exceed the cash price for which Dealer otherwise would have agreed to sell the same Vehicle to an ordinary retail purchaser on an "all cash" basis. Dealer may not charge a Customer an upcharge in excess of Dealer's costs or amounts actually paid or payable to third persons, which are included in the Contract, without first disclosing the existence of such an upcharge to the Customer. The term upcharge means all payments, and all fees for services such as taxes, titling and registrations fees, service warranty contract fees and similar fees for services provided by, or payments made to, third parties by Dealer, if the payments or fees charged to Customers are in excess of the fees or payments actually made by Dealer, but only where the failure to disclose such upcharge as a finance charge would constitute a violation of applicable laws or regulations. Once a Contract is purchased by and assigned to CF, Dealer shall cease for all purposes to have any security rights and interest in the Contract and in the Vehicle.

**CF's Discretion.** CF shall have no obligation to purchase any particular Contract or Contracts from Dealer. CF shall have absolute and total discretion with respect to which Contracts CF may agree to purchase. CF shall have the further right at all times and in its sole discretion: (1) to determine the extent to which, and the terms and conditions under which, CF will purchase Contracts from Dealer; (2) to establish and approve the form and provisions of Contracts; (3) to determine the types of Vehicles that may be leased under a Contract purchased by CF; (4) to establish minimum equipment requirements for leased Vehicles; (5) to determine the lease and credit terms of Contracts purchased by CF; and (6) to determine the creditworthiness of each Customer. Nothing under this Agreement, or under any existing or future agreement or understanding between the parties, whether in writing or in the form of oral statements, or any conduct or course of dealing on the part of CF, or on the part of its officers, employees or agents, may be construed by Dealer, or by Dealer's owners, partners, members, shareholders,

principals or management officials, or by any Customer, or by any court of law, or in arbitration, to in any way obligate or commit CF to purchase any particular Contract, or to amend, alter or in any way modify the discretionary nature of this Agreement.

**Right to Terminate Program.** CF shall have the right to terminate the Program, and to cease purchasing additional Contracts from Dealer, at any time, and for any or no reason, with or without cause. Dealer's representation and warranties in favor of CF, and Dealer's remarketing, indemnity, guaranty, repurchase, reserve, and additional obligations under this Agreement, shall remain in full force and effect notwithstanding CF's election to terminate the Program.

## APPLICATION AND CONSUMMATION PROCEDURES. Dealer agrees as follows:

**Acceptance of Lease and Credit Applications.** Dealer shall accept applications for leases or credit purchases, as applicable, from Dealer's Customers, and if Dealer desires to sell and assign a Contract to CF, Dealer shall promptly transmit the Customer's completed and signed application to CF electronically, and subsequently by mail. Neither Dealer nor any of Dealer's employees shall make any statement or representation to a Customer as to whether the Customer qualifies or pre-qualifies for a lease or credit purchase under CF's credit standards. Furthermore, neither Dealer nor any employee of Dealer may discourage a Customer from applying for a Lease or credit purchase, or refuse to accept an application from any Customer. Dealer shall advise each Customer of Dealer's intent to offer the Customer's Contract to CF.

**Additional Information Relating to Lease or Credit Sale of a Vehicle.** Dealer shall promptly provide CF with all necessary and pertinent information requested by CF with respect to Dealer's intended lease or credit sale of a Vehicle to the Customer.

**Approval and Acceptance Procedures.** If CF approves the Customer's lease or credit application, CF will notify Dealer of its approval, and Dealer shall then notify the Customer. Unless otherwise extended by CF in writing, the lease or credit sale must be consummated and the Contract must be executed within sixty (60) days following the date on which CF approved the Customer's lease or credit application.

**Denial Procedures.** If, for any reason whatsoever, CF declines to purchase the Contract of a particular Customer, CF will so notify the Dealer. CF will then take whatever action regarding such denial as CF deems necessary to comply with applicable law and regulation, including without limitation, advising the Customer of the denial, responding to Customer inquiries, and sending appropriate notices of adverse action to the Customer pursuant to the Federal Equal Credit Opportunity Act, the Federal Fair Credit Reporting Act, and any applicable state laws and regulations.

**Completion and Execution of Contracts.** If CF agrees to purchase a Contract from Dealer, Dealer shall complete the relevant portions of the Contract. Dealer shall then require the Customer to execute the completed Contract, which Dealer shall then immediately forward to CF. Dealer shall not permit or require the Customer to sign more than one original Contract.

**Delivery of Other Documents and Amounts.** Dealer shall deliver the following original documents to CF within fourteen (14) days of the Contract's execution: (1) the Customer's original lease or credit application signed by the Customer; (2) a copy of the manufacturer's certificate of origin of the Vehicle; (3) a copy of the manufacturer's invoice with respect to the Vehicle; (4) a copy of any vendor's invoice applicable to dealer-installed optional equipment; (5) a copy of the application for title, registration, and licensure of the Vehicle; (6) the original certificate of title to the Vehicle, which in a lease shall reflect CF as the record owner of the Vehicle, and in a credit sale shall reflect CF's first priority security interest; (7) a copy of any Agreement covering maintenance or service to the Vehicle; and (8) such other information, documents, and materials as CF may request from time to time. With respect to Leases, Dealer shall further deliver to CF funds representing the amount of the Customer's first monthly rental payment (including applicable lease and use taxes) collected at the time the Contract was signed, or alternatively no later than when the Vehicle was delivered to the Customer.

**Purchase Price/Advance Amount.** CF shall advise Dealer in writing from time to time, one or more times, of the buy rates or formulae used by CF to determine the purchase price/advance amount that CF is willing to pay to Dealer in consideration of and for the purchase of Contracts. CF shall have the right, and the full and complete discretion, to increase or decrease such buy rates from time to time, and to substitute other formulae or bases for determining the purchase prices/advance amounts of subsequently purchased Contracts.

**Funding; EFT and NACHA Authorization.** Following CF's receipt of the Customer's original signed Contract, CF will cause funds representing the Contract purchase price/advance amount to be wired or otherwise deposited into Dealer's designated operating account with Dealer's bank. In a lease, the amount of the Customer's security deposit will be deducted from/offset against the purchase price/advance amount paid to Dealer. Dealer authorizes CF to present National Automated Clearinghouse transactions, ACH debits and ACH credits, wire transfer credits and debits, and depository transfer checks of Dealer's designated depository bank and operating account. Dealer agrees that the National Clearinghouse Association ("NACHA") Operating Rules will govern electronic funds transfers ("EFT") deposited into Dealer's designated operating account. ACH transactions presented to Dealer's designated bank will be originated from CF. This EFT and NACHA authorization shall remain in full force and effect until such time that either Dealer or CF gives written notice to the other as provided in this Agreement.

**Credit Card Downpayments.** Where permitted by applicable law, Dealer may accept downpayments and initial Lease payments through the use of credit cards, provided that the risk of collection from the credit card issuer shall be solely the risk of Dealer.

**COMPLIANCE WITH APPLICABLE LAWS AND REGULATIONS; PROHIBITED DISCRIMINATION.** Dealer represents and warrants that Dealer shall comply with all applicable federal, state and local laws and regulations, including, but not limited to, the federal Truth in Lending Act, the federal Consumer Leasing Act, he Equal Credit Opportunity Act, the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, any other laws relating to the Contracts and all regulations promulgated thereunder. Without

limitation of the foregoing: (a) Dealer and its employees shall not discriminate in any respect against any applicant or potential applicant on a prohibited basis (as defined under any federal, state or local Equal Credit Opportunity Act or similar law); and (b) Dealer's marketing, joint marketing or other promotional activities, whether by written or oral agreement, shall comply with the joint marketing provisions of the Gramm-Leach-Bliley Act. CF shall in no way be responsible for Dealer's compliance under such fair lending laws and regulations, and Dealer shall fully indemnify CF from any and all liability to which CF may be exposed as a result of Dealer's discriminatory or prohibited acts and practices.

**DEALER'S REPRESENTATIONS AND WARRANTIES.** Dealer makes the following representations and warranties to CF:

**Dealer's Status.** Dealer is a duly authorized, franchised, motor vehicle dealership. Dealer is properly and lawfully organized as a corporation, partnership, limited partnership, limited liability company, or is a sole proprietorship, and is properly licensed and qualified to do business, and is in good standing, in each jurisdiction where such qualification and licensure is required. Dealer has and shall maintain and keep in effect all rights, licenses and franchises required for the conduct of its business, and shall carry on its business in a lawful manner.

**Authorization.** Dealer's execution, delivery and performance of this Agreement have been duly authorized, and do not conflict with, and will not result in a violation of, or constitute or give rise to an event of default, under any agreement or other instrument that may be binding upon Dealer, or any of its partners, members, or shareholders, or under any law, regulation, court decree or order applicable to Dealer, or any of its properties.

**Effectiveness.** Once properly executed, this Agreement is valid, binding and enforceable in accordance with its terms, as against Dealer and as against each of its owners, partners, members, or shareholders.

**Representations and Warranties with Respect to Each Customer.** (1) Each Customer is a bona fide individual or company. (2) If the Customer is an individual, the Customer is of the age of majority and has the legal capacity to enter into a lease or credit sale with Dealer, and to enter into a binding contract in the form of the Contract. (3) If Customer is a company, the Customer properly exists, and is in good standing under applicable law, and has the capacity and authority to enter into a lease or credit sale with Dealer, and to enter into a binding contract in the form of the Contract. (4) The Customer does not intend to use the purchased or leased Vehicle primarily for agricultural purposes.

**Representations and Warranties with Respect to the Lease or Credit Sale and the Vehicle.** (1) The Customer, the Vehicle and the provisions of the Contract correspond in all respects with the Customer, the Vehicle and the provisions of the proposed Contract for which approval was granted by CF. (2) The Vehicle and all accessories and options have been delivered to and accepted by the Customer in their present condition, and without reservation of rights. (3) The Vehicle is a U.S. specification vehicle, and would not be considered a gray market or altered vehicle. (4) The lease or credit sale of the Vehicle was bona fide and in the ordinary course of Dealer's business. (5) The agreed-upon value of the leased Vehicle, or the sales price of the Vehicle in a credit sales transaction, was equivalent to or less than the sales price that Dealer would have otherwise agreed to sell the same Vehicle to an ordinary retail purchaser on an "all cash" basis. (6) In a Lease, the Vehicle was leased to the Customer and sold to CF free of all liens, privileges, and encumbrances, including without limitation, free of any security interest or lien in favor of Dealer, the Vehicle manufacturer, and any floor plan lender. (7) In a Lease, the Vehicle was properly titled, licensed and registered in CF's name. (8) In a credit sale, the Vehicle was sold to the Customer free of all liens, privileges

to CF at the end of the Contract term. Specifically, and without limitation, Dealer agrees to complete the following procedures at no cost to CF: (1) test drive the Vehicle; (2) prepare a vehicle condition report in such form as CF may require, and which truly and accurately identifies damage to the Vehicle, and to the extent applicable, any excess wear and tear to the Vehicle, and excess mileage determined under the standards set forth in the Contract; (3) complete an odometer statement; (4) estimate the cost of repairs of any Vehicle damage and excess wear and tear; and (5) store the Vehicle for up to thirty (30) days. If offered by CF, Dealer shall have the option to purchase the Vehicle from CF under such terms and conditions as may then be acceptable to CF. In the alternative, and if requested by CF, Dealer agrees to sell the Vehicle on a consignment basis on CF's behalf at such price as may be acceptable to CF. Dealer further agrees to execute an appropriate UCC-1 financing statement evidencing CF's ownership interest in consigned or stored Vehicles.

**DEALER'S INDEMNITY OBLIGATIONS.** Dealer agrees to indemnify, to defend and to save and to hold CF, CF's parent, and all subsidiaries and affiliates of CF, and their respective officers, employees, agents and attorneys ("Indemnified Persons"), harmless from any and all claims, suits, obligations, damages, losses, costs, expenses (including without limitation, reasonable attorneys' fees and costs of defense), demands, liabilities, penalties, fines and forfeitures, of every nature and kind, that may be asserted against or incurred by such Indemnified Persons arising out of or in any way occasioned by this Agreement, or arising out of or resulting from any Contract purchased by CF, which is due to an action or in action on the part of Dealer or its employees. This includes, without limitation, any adverse claim, demand, administrative proceeding or lawsuit asserting that actions or in actions on the part of Dealer or of Dealer's officers, employees, or agents, were fraudulent, misleading, or constitute an unfair or deceptive practice, or violated any applicable federal or state law, rule, or regulation, or arising out of any other adverse claim, demand, administrative proceeding, or lawsuit in any way related to the Vehicle, or services provided by Dealer, or in any way arising directly or indirectly out of any default by Dealer under this Agreement. The foregoing indemnity obligations shall be continuous and shall survive CF's election to terminate the Program.

**CF'S INDEMNITY OBLIGATIONS.** CF agrees to indemnity, to defend and to save and to hold Dealer and its parent, and all subsidiaries and affiliates of Dealer and their respective officers, employees, agents and attorneys (the "Dealer Indemnified Parties"), harmless from any and all claims, suits, obligations, damages, losses, costs, expenses (including, without limitation, reasonable attorneys' fees and costs of defense), demands, liabilities, penalties, fines, and forfeitures, of every nature and kind, that may be asserted against or incurred by such Dealer Indemnified Parties that both (a) arise and come into existence after the date that CF purchases a Contract from Dealer and (b) arise out of CF's actions in servicing or collecting a Contract that CF has purchased from Dealer. The foregoing indemnity shall be continuous and shall survive CF's election to terminate the Program.

**PROTECTION OF CF's RIGHTS.** Dealer shall be fully responsible for any losses that CF may suffer as a result of anyone other than CF asserting any right to or interest in any leased or purchased Vehicle or in any purchased Contract. If and when requested by CF, Dealer will appear in and defend all actions and proceedings purporting to affect CF's rights and interest. Should Dealer fail to do what is required of it under this section, or if any action or proceeding is commenced or threatened naming CF as a party, or affecting CF's rights and interests, then CF may, without waiving any right or remedy that CF may have, and without releasing Dealer from any of its obligations, do whatever CF believes is necessary and proper within its sole discretion to protect CF's rights and interests.

**DEALER'S GUARANTY AND REPURCHASE OBLIGATIONS.** Dealer agrees to guarantee payment in full of, or alternatively to repurchase, each Contract that is affected or that may be affected by Dealer's failure to perform its obligations under this Agreement, or by a material breach of any of Dealer's representations and warranties as provided herein. Dealer further agrees to guarantee payment in full, or alternatively to repurchase, each Contract of a Customer, who may directly, or indirectly as a member of a class of similarly situated persons, assert or attempt to assert a claim, demand or defense against CF of a type that may be subject to Dealer's indemnity obligations under this Agreement. Dealer unconditionally agrees to pay to CF immediately on demand the unpaid balance of each guaranteed or repurchased Contract, in principal, interest, costs, expenses, collection attorney's fees and other fees and charges. Dealer waives any and all defenses that may be available to guarantors or sureties generally, and agrees that CF may extend payment under any Contract, or release any party to such Contract, without releasing or adversely affecting Dealer's guaranty and repurchase obligations hereunder. The foregoing guaranty and repurchase obligations shall be continuous and shall survive CF's election to terminate the Program. Additional recourse or repurchase obligations may be imposed upon Dealer as part of an Addendum to this Agreement and/or as part of Dealer's endorsement of a particular Contract.

**DEALER'S RESERVE ACCOUNT.** To the extent required by CF, Dealer shall establish and maintain a non-interest bearing Reserve Account with CF, which will serve as collateral security for Dealer's obligations under this Agreement. CF shall have the right to charge Dealer's Reserve Account at the times, and in the amounts, and under the circumstances, determined by CF to be necessary to satisfy Dealer's guaranty and repurchase obligations under this Agreement, any Addendum to this Agreement or any endorsement to a specific Contract. Dealer agrees to make payments into, and/or to apply credits towards, Dealer's Reserve Account. If for any reason the balance of Dealer's Reserve Account should ever fall below the then minimum amount then required by CF, Dealer unconditionally agrees upon demand to pay additional amounts into its Reserve Account as may be necessary to restore the balance to the required amount.

**INTENT OF THE PARTIES; GRANT OF SECURITY INTEREST.** CF and Dealer fully intend that the transactions occurring under this Agreement are true sales of the Contracts from Dealer to CF, and true purchases of the Contracts by CF from Dealer. However, to the extent that any court or administrative agency determines that the Program is a financing arrangement and not a true sale, and to further secure each and every obligation that Dealer may now and in the future owe to or incur in favor of CF, whether direct or indirect, absolute or contingent, due or become due, of every nature and kind, Dealer hereby grants CF a continuing security interest in all of Dealer's right, title and interest in the following property (collectively, the "Collateral"): (1) all chattel paper, to the fullest extent described and defined in the Code (as defined below), in any form, including without limitation, electronic chattel paper (to the fullest extent defined and described in the Code) and all Contracts, now existing or hereafter arising, which CF from time to time may purchase or agree to purchase from Dealer; (2) all motor vehicles of any make or model, owned by CF or in which CF has a security interest noted on title, including vehicles that have been foreclosed on, abandoned, surrendered or repossessed from or returned by any person obligated to CF under any Contracts, and vehicles with respect to which CF was the lessor or the assignee of the lessor's interest and which were delivered to Dealer's possession upon the termination of the Lease; and (3) all proceeds, to the fullest extent described and defined in the Code, of any of the foregoing, including, without limitation, all accounts, general intangibles, payment intangibles, chattel paper, electronic chattel paper, supporting obligations, documents (in each case to the fullest extent described and defined in the Code), motor vehicles and other goods and insurance proceeds. The definitions of proceeds and the types of property comprising the Collateral are intended to change, expand or contract as the definitions of proceeds and such types of Collateral that are set forth in the Code change, expand or contract. "Code" means the Uniform Commercial Code in the State of Michigan, as amended and replaced from time to time.

**PERFECTION.** CF may file whatever financing and continuation statements, amendments and other documents, and may take whatever additional actions, CF deems to be necessary and proper to perfect and continue perfection of CF's ownership interests in the Contracts, and of CF's security interest and rights granted hereunder. To the extent that CF may have previously filed financing statements affecting any of the Collateral, including Dealer's chattel paper, Dealer ratifies and confirms CF's authority to do so and the contents and binding effectiveness of such statements. CF may file a carbon, photographic, facsimile, other reproduction, or electronically authenticated or maintained copy of any financing statement or of this Agreement for use as a financing statement. CF may make electronic filings of financing and other statements. All filings including without limitation, electronic filings, shall be deemed to be complete and perfected for all purposes when made by CF, and may be made by CF without Dealer's consent and without the necessity that Dealer (or CF on Dealer's behalf) sign any such financing statements or other perfection document. Dealer shall reimburse CF for all expenses incurred with respect to perfection and continuation of the perfection of CF's ownership and security interests. Without limitation of the generality of the foregoing: (1) to the extent that any of the Collateral is held by a third party (such as consignee or bailee), (a) notice of the security interests created by this Agreement in such Collateral shall be given to each such third party, and (b) Dealer shall, upon request of CF, obtain and deliver to CF a written and signed acknowledgement from each such third party that it is holding the Collateral for the benefit of CF; (2) to the extent that any of the Collateral is comprised of electronic chattel paper, Dealer will ensure that, (a) there is only one identifiable authoritative copy of the electronic chattel paper record, (b) the authoritative electronic chattel paper record for all electronic chattel paper purchased by CF will identify CF as the owner/lessor/lender thereunder, (c) the authoritative electronic chattel paper record for all electronic chattel paper purchased by CF will be transferred to and maintained by CF or by a third party custodian designated by CF, and (d) changes or additions to the electronic chattel paper may not be made without the consent of CF; and (3) to the extent that any of the Collateral is comprised of types of Collateral that can be perfected by possession, or by either possession or filing, all such Collateral shall be delivered to CF. CF is authorized, at Dealer's cost and expense, to obtain all post-filing searches from all jurisdictions that CF deems advisable to confirm the proper priority of all filings made by CF under this Agreement.

**COLLATERAL AND DEALER RELATED REPRESENTATIONS AND COVENANTS.** So long as any Contract remains outstanding, CF does not authorize, and Dealer agrees not to: (1) sell or lease any of the Collateral to any person or entity other than CF; (2) license any of the Collateral; (3) grant any other security interest in any of the Collateral, whether subordinate or superior to the security interests granted herein; or (4) merge Dealer into, have Dealer acquire or be acquired by, or consolidate Dealer with any other person or entity; in each of cases (1) through (4) above, without the prior written consent of CF. Dealer further agrees that the Collateral is and will continue to be located in the states in which Dealer currently does business. Dealer will not change, or consent to any change, in the state in which any Vehicle is titled. The location of Dealer's residence, if Dealer is an individual or sole proprietorship, or principal place of business, if Dealer is a business entity that is created without any state filings, is and will continue to be the state recited in the address of Dealer following its signature to this Agreement. The exact legal name of Dealer is and will continue to be the name indicated in the signature block for Dealer at the end of this Agreement. Dealer is a duly organized entity of the type described in, and Dealer's state of organization is the state recited in, the signature block for Dealer at the end of this Agreement. Dealer will not change its organizational structure (i.e. convert from a corporation to a limited liability company, etc.) or state of organization, in each case, without the prior written consent of CF. While Dealer has no right to take any of the actions described in this Section without the prior written consent of CF, if Dealer does so it will immediately notify CF of any such actions.

**REMEDIES.** Upon any default by Dealer of its obligations under this Agreement, CF may exercise such rights and remedies as may be available to CF at law, or in equity, including, without limitation, exercise of such rights and remedies with respect to the Collateral as may be available generally to secured parties under the Code. Without limitation, CF may: (1) peaceably re-possess any Collateral then in Dealer's possession or control; (2) enforce the Contracts and any obligations supporting the Collateral, including, without limitation, guaranties and other security documents and agreements; and (3) sell and dispose of the Collateral. Dealer agrees: (a) to assemble the Collateral and deliver it to CF (to the extent it is not already in CF's possession); (b) that CF may pursue Dealer or the Collateral without first pursuing any guarantor; (c) that CF has no obligation to clean-up or otherwise prepare any Collateral for sale; (d) that CF may disclaim any warranties of title, fitness or any similar warranties upon the sale of any Collateral; (e) that Dealer waives and agrees not to assert any claims and defenses it may have against CF and that are legally waivable; (f) that CF may comply with any applicable state or federal law requirements in connection with the Collateral and the disposition thereof and such compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral; and (g) that ten (10) days prior written notice of any sale of the Collateral (other than Collateral quickly diminishing in value or existence, for which shorter notice periods will be allowed) shall be deemed to be reasonable notice for such sale, whether such sale is public, private, or a strict foreclosure.

**ELECTRONIC ACTIONS.** All rights and remedies of CF under this Agreement may be performed and accomplished electronically to the extent otherwise permitted by applicable law, including, without limitation, electronic filings, electronic notices, electronic accountings and electronic enforcement, collection, realization and foreclosure activities.

**RELATIONSHIP.** Nothing in this Agreement or in the course of performance hereof shall be construed by the parties hereto, or by any court or administrative agency, or by an arbitrator, as making either Dealer or CF the agent, employee or legal representative of the other, or as making the parties to this Agreement partners or joint ventures in any respect. The relationship of Dealer to CF, and CF to Dealer, shall be that of independent contractors. Dealer is not granted any express or implied right to represent or bind CF in any manner. To the extent necessary and appropriate, Dealer agrees to explain to each Customer that Dealer is not CF's agent or representative, and that Dealer has no right to bind, obligate or commit CF in any way.

**POWER OF ATTORNEY.** Dealer irrevocably appoints CF as its true and lawful attorney-in-fact, coupled with an interest, and with full power of substitution, for the purpose of accomplishing any and all of the following actions: (1) To sign Dealer's name on any UCC-1 financing statement, motor vehicle bill of sale, certificate of title or registration, or application or form submitted to a public agency, and/or on any other document necessary to perfect CF's ownership, security and other rights and interests in and with respect to the Vehicles, Contracts purchased from Dealer and the other Collateral. (2) To demand, collect or receive, receipt for, sue and recovery all sums of money and which may now and in the future become due, owing and payable with respect to each purchased Contract or other Collateral. (3) To sign Dealer's name on any check, draft or other instrument received in payment or as proceeds under any purchased Contract or other Collateral. (4) To assert, settle and compromise any and all claims arising with respect to each leased or sold Vehicle, and with respect to each purchased Contract or other Collateral. (5) To further act in Dealer's name, place and stead to perform such acts that may be required of Dealer under this Agreement, of which Dealer may not fully, or may refuse to perform for any or no reason, or that Dealer may delay in performing. (6) To contact Customers and other parties to confirm balances owed under Contracts and other Collateral, and to verify such other information as CF may request or require. CF may take any and all of the above actions as CF

may deem to be necessary and proper within CF's sole and exclusive discretion, without any obligation to do so. CF agrees that: (a) unless a default exists under this Agreement (in which case no presentation of documents or instruments will be required under this clause (a)), CF will not exercise its rights under clauses (1) and (3) above unless the applicable document or instrument signed by CF has first been presented to Dealer for execution; and (b) CF will not exercise its rights under clauses (2), (4) and (6) above unless a default exists under this Agreement. This power of attorney is irrevocable and shall remain in full force and effect until renounced by CF in writing.

**EXECUTION OF ADDITIONAL DOCUMENTS.** Dealer agrees to execute such additional documents, instruments and agreements as CF may deem necessary and appropriate, within CF's sole discretion, and in form and substance satisfactory to CF: (1) to keep this Agreement in effect; (2) to better reflect the true intent of this Agreement; (3) to consummate fully all of the transactions contemplated hereby, and under all other agreements, instruments or documents heretofore, now or at any time or times hereafter executed by Dealer and delivered to CF; and (4) to perfect and protect CF's interest in the Collateral.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Advertising.** Dealer agrees not to identify CF in any advertising placed in any medium (including signs on Dealer's premises) without prior written approval from CF.

**Amendment and Replacement of Prior Agreements.** This Agreement amends, supplements and replaces all prior agreements and written and verbal understandings, between the parties with respect to all matters discussed in or relating to this Agreement.

**Amendments.** This Agreement constitutes the entire understanding and agreement of the parties as to the matters set forth herein. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Applicable Law.** This Agreement has been delivered to CF and accepted by CF in, and shall be governed by and construed in accordance with the laws of, the State in which Dealer is located, without respect to conflict of laws principles.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Effective Date.** This Agreement is effective as of the date first written above.

**Electronic Storage; Reproduction Deemed an Original.** CF may electronically store and preserve this Agreement, and discard and destroy the original signed document. Any reproduction of this Agreement derived from CF's electronic storage system shall be deemed to be original and authentic, and may serve in the place of the original signed document for all purposes.

**Enforcement Expenses.** Should it become necessary for CF to retain the services of an attorney to protect and enforce CF's rights and remedies as against Dealer, or against third persons asserting rights to or an interest in a Contract or Vehicle, Dealer agrees to reimburse CF for its reasonable attorneys' fees and expenses of enforcement for both inside and outside counsel.

**Jury Waiver.** Dealer and CF waive the right to trial by jury in any lawsuit brought by any party against any other party.

**Limitation on CF's Liability to Dealer.** CF shall have no liability to Dealer, or to Dealer's owners, partners, members, shareholders, principals or management officials, or to any

other person or entity, for any action taken or omitted to be taken under or in connection with this Agreement, other than as a direct result of CF's gross negligence or willful misconduct.

**Notices.** To give Dealer any notice required under this Agreement, CF may hand deliver, electronically transmit, or mail such notice to Dealer. CF will deliver or mail any notice to Dealer at any address which Dealer may have given CF by written notice as provided in this paragraph. All notices required or permitted under this Agreement must be in writing and will be considered as given on the day it is delivered by hand, electronically transmitted, or deposited in the U.S. Mail, by registered or certified mail to the address specified in this Agreement.

**Setoff.** Dealer agrees that CF may set-off any funds obligations that it may hold or owe to Dealer against any of Dealer's obligations and liabilities to CF under this Agreement.**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity. However, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

**Sole Discretion of CF.** Whenever CF's consent or approval is required under this Agreement, the decision as to whether or not to consent or approve shall be in the sole and exclusive discretion of CF and CF's decision shall be final and conclusive.

**Nominee's and Designee's of CF.** Dealer shall, upon receipt of notice (a "Nominee Notice") from CF, transfer and assign any Contract purchased hereunder directly to any nominee or designee of CF, as indicted in the Nominee Notice. A Nominee Notice may relate to a single Contract or any number or types of Contracts. For example, a Nominee Notice could direct Dealer to assignee all purchased Leases and leased Vehicles to a trust. Upon receipt of a Nominee Notice, Dealer will take all actions required to carry out the terms of the Nominee Notice, including, without limitation: (a) using new forms of the Contracts required by CF; (b) assigning all indicated Contracts to the nominee or designee; (c) titling all leased Vehicles in the nominee or designee; and (d) having the nominee or designee noted as the lienholder of record on the titles to all credit sales Vehicles. If and when any Contract is assigned to a nominee or designee and/or any of the other actions described above is taken with respect to a nominee or a designee, the nominee or designee shall automatically be assigned, and shall succeed to, all of the rights and remedies of CF under this Agreement as to the covered Contracts and Vehicles, as if an express assignment of CF's rights and remedies under this Agreement had occurred.

**Successors and Assigns Bound.** Dealer's obligations and agreements under this Agreement shall be binding upon Dealer's successors, heirs, legatees, devisees, administrators, executors and assigns, as well as upon each of Dealer's owners, partners, members, or shareholders. However, notwithstanding the foregoing provision, Dealer shall have no right to assign this Agreement to a third party without obtaining CF's prior written consent, which CF shall have the right to withhold for any or no reason.

**Tax Benefits.** All tax benefits associated with or derived from the ownership of leased vehicles shall accrue to and be retained by CF.

**Unconditional and Irrevocable Nature of Agreements and Consents.** Dealer's covenants, agreements and consents under this Agreement are unconditional and irrevocable, and may not be withdrawn or otherwise revoked by Dealer under

any circumstance, other than as a result of CF's prior written consent, which CF has the right to reject or withhold for any or no reason, with or without cause.

**Waiver.** CF will not be deemed to waive any right or remedy under this Agreement unless the waiver is specific, and in writing signed by CF's authorized representative. No delay or omission on the part of CF in exercising any right or remedy may be construed by Dealer, or by Dealer's owners, partners, members, shareholders, principals, or management officials, or by any court of law or in arbitration, as a waiver or forbearance of any right or remedy that may be available to CF. CF's written waiver of a provision of this Agreement will not prejudice, and may not in any way be construed as a waiver of CF's right otherwise to demand strict compliance with that provision, or with any other provision of this Agreement. No course of dealing between CF and Dealer may be construed as a waiver of any of CF's rights or remedies, or of any obligation of Dealer.

**No Third Party Beneficiaries.** This Agreement is intended for the sole and exclusive benefit of CF and Dealer. No other persons or entities (including, without limitation, any Customers) shall be considered to be third party beneficiaries under this Agreement or to have any rights to rely upon the terms, provisions, covenants, representations or agreements set forth in this Agreement.

**CONFIDENTIALITY OF NONPUBLIC PERSONAL INFORMATION.** In the course of its performance under this Agreement and other agreements with Dealer, CF may disclose to Dealer information that meets the definition of "nonpublic personal information" ("Nonpublic Personal Information") in the regulations

promulgated under Title V of the Gramm-Leach-Bliley Act of 1999 as amended from time to time, 15 U.S.C. 6801 to 6809. ("GLB Act Privacy Regulations"). Dealer shall not use or disclose such Nonpublic Personal Information to any nonaffiliated third party except (1) to the extent necessary to carry out the purpose or purposes for which CF discloses such information to Dealer, or (2) in the ordinary course of business to carry out the purpose or purposes for which the Nonpublic Personal Information was disclosed to Dealer under an exception to the GLB Act Privacy Regulations. Dealer agrees that any affiliate of Dealer shall use and disclose Nonpublic Personal Information to any nonaffiliated third party only to the extent that Dealer may use and disclose such information. If Nonpublic Personal Information is disclosed to Dealer in connection with marketing, joint marketing or other promotional activities, whether by written or oral agreement, Dealer shall use and disclose such Nonpublic Personal Information only (1) to the extent necessary to carry out the activity or activities for which such Nonpublic Personal Information is disclosed to Dealer or (2) in the ordinary course of business to carry out the purpose or purposes for which the Nonpublic Personal Information was disclosed to Dealer under an exception to the GLB Act Privacy Regulations.

**SAFEGUARDING NONPUBLIC PERSONAL INFORMATION.** Dealer shall maintain physical, electronic and procedural safeguards in compliance with applicable federal and state regulations to protect the Nonpublic Personal Information received from CF, including, but not limited to, the maintenance of appropriate safeguards to restrict access to Nonpublic Personal Information received from CF to those employees, agents or service providers of Dealer who need such information to carry out the purpose or purposes for which such Nonpublic Personal Information was disclosed to Dealer.

DEALER HEREBY CERTIFIES THAT: (1) DEALER HAS CAREFULLY READ THIS AGREEMENT AND AGREES TO ALL OF ITS TERMS AND
CONDITIONS AS WRITTEN; (2) DEALER EITHER CONSULTED WITH AN ATTORNEY, OR HAD THE OPPORTUNITY TO DO SO, PRIOR
TO EXECUTION OF THIS AGREEMENT; (3) DEALER KNOWINGLY CONSENTED TO ALL WAIVERS CONTAINED IN THIS AGREEMENT;
AND (4) NEITHER CF NOR ANYONE CONNECTED WITH CF HAS MADE ANY STATEMENT OR PROMISE TO DEALER THAT MAY
CONTRADICT IN ANY WAY WHAT IS WRITTEN IN THIS AGREEMENT.

IN WITNESS WHEREOF, DEALER AND CF HAVE EXECUTED THIS AGREEMENT EFFECTIVE AS OF THE DAY, MONTH AND YEAR
FIRST WRITTEN ABOVE.

| DEALER Suburban Dodge of Berwyn, Inc. | | DAIMLERCHRYSLER SERVICES NORTH AMERICA LLC | |
|---|---|---|---|
| ENTITY TYPE Corporation | STATE OF ORGANIZATION Illinois | ENTITY TYPE Limited Liability Company | STATE OF ORGANIZATION Michigan |
| BY | ITS Pres.don | BY | ITS Dir. |
| NAME | | NAME | |
| ADDRESS | | ADDRESS | |
| CITY | STATE   ZIP | CITY | STATE   ZIP |

## CONTINUING GUARANTY

I (WE) HEREBY JOINTLY, SEVERALLY AND UNCONDITIONALLY GUARANTEE THE PROMPT AND COMPLETE PERFORMANCE OF
DEALER'S REMARKETING, INDEMNITY, GUARANTY, REPURCHASE, RESERVE AND ADDITIONAL OBLIGATIONS IN FAVOR OF CF
UNDER THE ATTACHED MOTOR VEHICLE DEALER AGREEMENT.

I (WE) WAIVE ALL DEFENSES THAT MAY BE AVAILABLE TO US AS A GUARANTOR AND SURETY OF THE OBLIGATIONS AS
GUARANTEED HEREUNDER.

| GUARANTOR Donald E. Jeffers | DATE | GUARANTOR William Shea | DATE |
|---|---|---|---|
| BY | | BY | |
| NAME | ITS | NAME | ITS |
| ADDRESS | | ADDRESS | |
| CITY | STATE   ZIP | CITY | STATE   ZIP |

# CHRYSLER FINANCIAL

## PRINCIPAL AND INTEREST ADDENDUM TO CAPITAL NOTE

| LOAN NO. | DEALER NO. |
|---|---|
| 22154 | 44028 |

**Borrower:**                              **Lender: DaimlerChrysler Services North America LLC**

Suburban Dodge of Berwyn, Inc.
7060 W. Ogden Ave.
Berwyn, IL 60402

**Date:** 1-23-04

And All Additional Borrowers Borrowing from Lender

This is an Addendum to a Capital Note in the principal amount of <u>nine hundred seventy five</u>
<u>thousand and 00/100 dollars</u>
($ <u>975,000.00</u>     ), of even date herewith (the "Capital Note"), evidencing a Capital Loan to Borrower from DaimlerChrysler Services North America LLC, as Lender, pursuant to a certain Master Loan and Security Agreement (the "Agreement") dated <u>February 8</u> (yr.) <u>2002</u>. Each Borrower unconditionally agrees as follows:

**DEFINITIONS.** The following additional definition applies under this Addendum.

    **Addendum.** The term "Addendum" refers to this Principal and Interest Addendum to Capital Note, as this Addendum may be amended, modified or supplemented from time to time, and to all exhibits and schedules that may be referred to in or attached to this Addendum.

**AMENDMENT AND SUPPLEMENT TO CAPITAL NOTE.** This Addendum modifies, amends and supplements the terms of the Capital Note to the extent provided herein and for all purposes shall be considered a part of the Capital Note. All provisions of the Capital Note not modified, amended and supplemented by this Addendum shall remain in full force and effect, and are not affected by this Addendum.

The Capital Note is hereby amended and supplemented to provide as follows:

**PRINCIPAL AND INTEREST PAYMENTS.** Principal and interest under the Capital Note shall be paid on a monthly basis in <u>sixty</u>                                (<u>60</u>) monthly installments, each in an amount equal to the sum of (a) <u>sixteen thousand two hundred fifty</u>
                                    and <u>00</u>     /100 Dollars
($ <u>16,250.00</u>     ) of principal reduction, plus (b) all then accrued but unpaid interest under the Note, on the fifteenth (15th) day of each month, commencing on the fifteenth (15th) day of <u>February</u> (yr.) <u>2004</u>, and continuing on the fifteenth (15th) day of each month thereafter, until <u>January 15</u> (yr.) <u>2009</u>, at which time the entire outstanding principal balance under the Capital Note, and all accrued but unpaid interest thereunder, shall be immediately due and payable in full.

| BORROWER: | BORROWER: |
|---|---|
| Suburban Dodge of Berwyn, Inc. | |
| BY: | BY: |
| NAME: Donald Jeffers | NAME: |
| ITS: President | ITS: |

| BORROWER: | BORROWER: |
|---|---|
| BY: | BY: |
| NAME: | NAME: |
| ITS: | ITS: |

84-291-7263 (12/01)                                                 JF (9/01)

# CHRYSLER FINANCIAL

## NOTICE OF ASSIGNMENT (Deposit Accounts)

| LOAN NO. | | DEALER NO. |
|---|---|---|
| | | 44028 |

To: Harris Bank
1000 N. Lake Shore Dr.
Chicago, IL 60611

Account No.: 8501232111

From:
Suburban Dodge of Berwyn, Inc.
7050 W Ogden Ave.
Berwyn, IL 60402

Date: 2/8/02

Please be advised that we have granted a security interest in favor of DaimlerChrysler Services North America LLC ("Chrysler Financial") in our inventory, equipment, other collateral, and collateral proceeds, including any rights that we have to all funds now and in the future on deposit in our account(s) with you.

We have designated the account or accounts for which the account numbers have been set forth above as, collectively, the "Operating Account" into which we will deposit cash and cash equivalent proceeds derived from the sale, lease or other disposition of Chrysler Financial's collateral. We have agreed that these proceeds belong to Chrysler Financial, and that at all times while we may hold the proceeds (whether directly or in the form of deposits with you), we will hold such funds "in trust" for and on behalf of Chrysler Financial.

Under our agreement with Chrysler Financial, we have the continuing right to write checks on, to make deposits into, and withdrawal funds from the Operating Account until such time as Chrysler Financial instructs you to turn over any funds then on deposit in the Operating Account to Chrysler Financial. We authorize and direct you to follow Chrysler Financial's instructions to this effect.

We authorize and direct you to respond to any inquiries that you may receive from Chrysler Financial with respect to us, our accounts, and generally, our financial dealings with you. We waive all rights of privacy and confidentiality that we may have with respect to information and comments that you may provide to Chrysler Financial, and we release and relieve you and your employees and agents from any and all liability in this respect.

Please sign the following Acknowledgment and return this form to Chrysler Financial at the below address.

| DEALER | | ADDRESS | | |
|---|---|---|---|---|
| Suburban Dodge of Berwyn, Inc. | | 7050 W Ogden Ave. | | |
| BY | | CITY | STATE | ZIP |
| | | Berwyn | IL | 60402 |
| NAME | | ITS | | |

## ACKNOWLEDGMENT

By signing this Acknowledgement, Bank agrees that: (a) the Operating Account is/are a deposit account under the Uniform Commercial Code, as amended from time to time; (b) it will abide by the terms of this letter; (c) it subordinates to Chrysler Financial all liens, encumbrances, claims and rights of set-off in the Operating Account or in any funds in the Operating Account, other than Bank's customary fees and charges with respect to the maintenance of the Operating Account.

| BANK | | ADDRESS | | |
|---|---|---|---|---|
| Harris Bank | | 6889 Stanley Ave | | |
| BY | | CITY | STATE | ZIP |
| | | Berwyn | IL | 60402 |
| NAME | | ITS | | |
| Tracy L Brae | | | | |

Please sign and return this form to Chrysler Financial

84-291-7248 (12/01)

JF (6/01)

# CHRYSLER FINANCIAL

## MASTER LOAN AND SECURITY AGREEMENT
## VARIABLE INTEREST RATE SCHEDULE
## (PRIME RATE)

**SCHEDULE 1**

| LOAN NO. | DEALER NO. |
|---|---|
|  | 44028 |

**Borrower:**
Suburban Dodge of Berwyn, Inc.
7050 W Ogden Ave.
Berwyn, IL 60402

**Lender: DaimlerChrysler Services North America LLC**

**Date:** 2/8/02

And All Additional Borrowers Borrowing from Lender

This Schedule 1 supplements and is a part of the Master Loan and Security Agreement (the "Agreement") to which this Schedule 1 is attached.

**DEFINITIONS.** All terms defined in the Agreement shall have the same meaning in this Schedule 1.

**SUPPLEMENT TO AGREEMENT.** The parties agree that the Agreement between them is hereby supplemented to additionally provide as follows:

**Interest Rate Factors.** The Interest Rate Factors that initially applied to Borrower's Loans and Obligations are as follows:

(1) On all Loan Advances to finance the purchase acquisition of new motor vehicle inventory — One percent ( 1 %) in excess of the Prime Rate as herein defined, per annum, adjustable on the 1st and 16th day of each calendar month.

(2)(a) On all Loan Advances to finance the purchase acquisition of used motor vehicle inventory from the current model year and the two most recent past model years — One percent ( 1 %) in excess of the Prime Rate as herein defined, per annum, adjustable on the 1st and 16th day of each calendar month.

(b) On all Loan Advances to finance the purchase acquisition of all other used motor vehicle inventory — One and three fourths percent ( 1.75 %) in excess of the Prime Rate as herein defined, per annum, adjustable on the 1st and 16th day of each calendar month.

(3) On all Loan Advances to finance the purchase acquisition of DRAC vehicles. — One percent ( 1 %) in excess of the Prime Rate as herein defined, per annum, adjustable on the 1st and 16th day of each calendar month.

(4) On all Capital Loans — a per annum rate announced by Lender as being in effect for Capital Loans from time to time.

**Interest Rate Index.** The Interest Rate Index that applies to Borrower's Loans and Obligations is the "Prime Rate" as published by The Wall Street Journal, Midwest Edition, from time to time in its "Money Rates" column as the prevailing prime interest rate charged by money center banks in New York, New York. If for some reason The Wall Street Journal ceases to publish such Interest Rate Index, or substantially changes the methodology used to determine such Interest Rate Index, then such Interest Rate Index may be otherwise independently determined by Lender from an alternative source available to Lender, or may be calculated by Lender on a basis substantially similar to the methodology formally used by The Wall Street Journal.

**Initial Prime Rate.** The Prime Rate as of ___December 16___ (yr.) _2001_, is ___four and three fourths___ percent ( 4.75 %) per annum.

**Adjustments in Variable Interest Rates.** The variable interest rates applicable to Borrower's Loans and other Obligations are subject to adjustment twice each month, as of the 1st and 16th day of each calendar month (the "Adjustment Dates"), in accordance with the above formula and the Prime Rate in effect at such time. Lender will notify Borrower of each variable interest rate adjustment, and Borrower's receipt of each subsequent interest rate adjustment notice shall for all purposes affirm and evidence Borrower's unconditional agreement to pay interest to Lender at the rate or rates provided therein.

**Lender's Right To Adjust Interest Rate Factors.** Lender shall have the right, at any time and within Lender's sole discretion, to increase or decrease the Interest Rate Factors that apply to Borrower's Loans and other Obligations based upon number of factors, including without limitations, Lender's transactional experience with Borrower. Lender will advise Borrower in writing of any such increases or decreases in the Interest Rate Factors. Borrower will conclusively be deemed to agree to such increases or decreases upon receipt of Lender's written notice unless Borrower promptly notifies Lender in writing of Borrower's intention to terminate its borrowing relationship with Lender, at which time all outstanding Loans and other Obligations of Borrower to Lender shall be fully due and payable.

**Default Rate Interest.** After the occurrence and during the continuance of an Event of Default (as defined in the Agreement), all Loans, Advances and other Obligations shall bear interest at a default rate determined by Lender, not to exceed the highest rate permitted under applicable law.

BORROWER'S AGREEMENT TO THIS SCHEDULE 1. This Schedule 1 forms a part of and is directly into the Agreement between the parties.

84-291-7253 (12/01)                                                JF (9/01)

# CHRYSLER FINANCIAL

## MASTER LOAN AND SECURITY AGREEMENT

| LOAN NO. | | DEALER NO. |
|---|---|---|
| | | 44028 |

Borrower:
Suburban Dodge of Berwyn, Inc.
7050 W Ogden Ave.
Berwyn, IL 60402

Lender:  DaimlerChrysler Services North America LLC

Date: _2/8/02_

And All Additional Borrowers Borrowing from Lender

This Agreement is a MASTER LOAN AND SECURITY AGREEMENT between DaimlerChrysler Services North America LLC as Lender, and the above-named entity as Borrower, as well as all additional Borrowers obtaining Loans from Lender pursuant to this Agreement. Borrower and each Guarantor unconditionally agree as follows:

DEFINITIONS. The following definitions apply under this Agreement.

Advance. The term "Advance" refers to each disbursement of Loan funds under this Agreement.

Affiliate. The term "Affiliate" refers to any person or entity which, directly or indirectly, controls, is controlled by, or is under common control with Borrower.

Agreement. The term "Agreement" refers to this Master Loan and Security Agreement, as this Agreement may be amended, modified or supplemented from time to time, and to all addenda, exhibits and schedules that may be referred or attached to this Agreement.

Amount Financed. The term "Amount Financed" refers to the principal amount of each Advance to finance the purchase/acquisition of items of Borrower's Financed Inventory and Equipment.

Borrower. The term "Borrower" refers individually, collectively and interchangeably to each and every entity obtaining Loans pursuant to this Agreement, including the entity first named above, and all additional Borrowers who may now and in the future agree to be subject to this Agreement, and who may sign the signature page of this Agreement, or who may be listed in one or more addenda attached to this Agreement. The term "Borrower" additionally refers individually, collectively and interchangeably to an Affiliate or other entity, who may agree to grant Lender a continuing security interest in its Collateral to secure Borrower's present and future Loans and Obligations, and who may sign the signature page of this Agreement, or who may be listed in one or more addenda attached to this Agreement.

Code. The term "Code" refers to the Uniform Commercial Code as enacted in each state where a Borrower is organized, or has offices or other facilities, as amended and replaced from time to time.

Collateral. The term "Collateral" refers to the following described present and future property and rights of Borrower: (a) all Inventory, including without limitation, all new and used motor vehicle and parts Inventory, including without limitation, all Inventory on order, but not yet delivered to Borrower, and all consigned goods; (b) all Equipment, including without limitation, all furniture, fixtures, machinery, tools, and all additions, substitutions, replacements, accessories, attachments and accessions; (c) all investment property; (d) all accounts, contract rights, tangible chattel paper, electronic chattel paper, instruments, documents, promissory notes, and supporting obligations; (e) all general intangibles, payment intangibles, franchise rights, books, records, files, computer disks, software, involving or emanating from Borrower's business or assets; (f) all rights to receive payment, credits, and other compensation (including without limitation, all holdbacks, incentive payments, stock rebates, allowances, and additional "factory credits") from any manufacturer, distributor, or supplier of Inventory or Equipment, or from any of their subsidiaries or affiliates; (g) all payments and credits that Lender may owe to Borrower, and all funds of Borrower that Lender may have or retain in its possession, whether in the form of cash collateral, reserve, contingency or escrow accounts, or otherwise; and (h) all proceeds (to the fullest extent defined and described in the Code) of the foregoing, including without limitation proceeds of proceeds, goods received in trade, claims and tort recoveries, insurance proceeds, refunds of insurance premiums, proceeds derived from Borrower's sale or assignment of chattel paper, and all cash and other funds held in all deposit accounts in which proceeds may be deposited; in each of clauses (a) through (h) above, to the fullest extent defined and described in the Code. The definitions of proceeds and the types of Collateral described in this section are intended to change, expand and contract as the definitions and descriptions of proceeds and such types of Collateral that are set forth in the Code change, expand or contract.

Equipment. The term "Equipment" has the meaning provided in the Code, and includes both Financed Equipment and other non-financed Equipment that may comprise part of the Collateral.

Event of Default. The term "Event of Default" refers to each and every event of default listed in this Agreement and in each Related Document.

Financed Inventory and Equipment. The terms "Financed Inventory" and "Financed Equipment", or any combination, refer to Borrower's new and used Inventory and/or Equipment, the purchase of which is financed in whole or in part under an Advance made pursuant to this Agreement.

Guarantor. The term "Guarantor" refers individually, collectively and interchangeably to each and every person and entity guaranteeing payment of any Obligation in favor of Lender. If there is more than one Borrower under this Agreement, each Borrower is a Guarantor of each other Borrower's Obligations.

Inventory. The term "Inventory" has the meaning provided in the Code, and includes both Financed Inventory and other non-financed Inventory that may comprise part of the Collateral.

Lender. The term "Lender" refers to DaimlerChrysler Services North America LLC its successors and assigns, and each subsequent holder of any Obligation.

Loan. The term "Loan" refers to each and every Advance, extension of credit, and other credit accommodation that Lender may extend to Borrower, or to others on Borrower's

behalf. "Loan" also includes Lender's purchase from the Borrower of accounts, chattel paper, electronic chattel paper, instruments, promissory notes, documents, general intangibles, payment intangibles, or extensions of credit owed by Borrower to an Inventory or Equipment manufacturer, distributor or supplier.

**Net Sale or Lease Proceeds.** The term "Net Sale or Lease Proceeds" refers to the amount received by, or credited to Borrower as a result of the sale, lease or other disposition of Borrower's Financed Inventory and Equipment, after deduction of sales and other taxes payable to governmental entities, motor vehicle license, title, registration and recordation fees, and other fees, charges and amounts that are payable to third persons or its Affiliates.

**Obligation.** The term "Obligation" refers to each and every present and future Loan, and all other present and future indebtedness, obligation and liability that Borrower may incur in favor of Lender, whether direct or indirect, absolute or contingent, liquidated or unliquidated, due or to become due, of every nature and kind, in principal, interest, fees, costs, expenses and attorneys' fees, including without limitation, all other indebtedness, obligations, fees, costs and expenses for which Borrower and each Guarantor may be responsible under this Agreement and under each Related Document.

**Operating Account.** The term "Operating Account" refers to Borrower's designed deposit account into which Borrower deposits Collateral proceeds.

**Ordinary Course of Business.** The term "ordinary course of business" has the meaning provided in the Code, and includes sales and leases of Inventory to individuals and business entities at retail, as well as isolated sales of individual vehicles and Inventory items to other non-affiliated dealers.

**Promptly.** The term "promptly" means to make payment or to complete whatever actions are required under this Agreement, or under any Related Document, in an expeditious manner.

**Related Document.** The term "Related Document" refers to each and every additional agreement, addendum, guaranty, mortgage, deed of trust, security agreement, financing statement, and other instruments and documents in any way relating to any Loan or Obligation, or relating to any other relationship between the parties. The term "Related Document" additionally includes without limitation any agreement under which Lender may agree to purchase retail installment contracts and/or vehicle leases from Borrower on a recurring basis.

**Additional Definitions; Construction.** All terms not otherwise defined in this Agreement have the meanings provided in the Code, and as found in the other laws, and as used in the commercial practices, of the state whose law governs this Agreement. In this Agreement, singular words include the plural, and the plural words include the singular.

**REQUESTS FOR LOAN ADVANCES.** So long as no Event of Default exists, and until such time as Lender may elect to terminate Borrower's ability to request future Advances under this Agreement, Borrower may request Lender to extend credit in the form of Advances to finance or partially finance Borrower's purchase of Inventory and/or Equipment from manufacturers, distributors and suppliers, and for such other permitted purposes as Lender may agree to within its sole discretion. Requests for Loan Advances must be made in accordance with procedures established by Lender from time to time, and must be accompanied by whatever documentation Lender may then require. Requests for Loan Advances may be submitted by any officer or other authorized representative of Borrower. Oral requests must be confirmed in writing.

**ABSOLUTE DISCRETIONARY NATURE OF LENDING RELATIONSHIP.** Lender has no obligation whatsoever, under this Agreement or otherwise, to make Loans to Borrower under any

circumstance. Lender's decision to do so is and shall always be solely within Lender's exclusive judgment and discretion, and Lender may refuse to make Loans to Borrower, and may limit the purpose or purposes for which the proceeds of an Advance may be used, and may limit the amount of aggregate Loan Advances or the amount of any single Advance, for any or no reason, with or without cause. Nothing under this Agreement, or any other existing or future agreement or understanding between the parties, whether in writing or in the form of oral statements, or any conduct or course of dealing on the part of Lender, or on the part of its officers, employees, agents, or attorneys, may be construed by Borrower, or by Borrower's owners, principals or management officials, or any Guarantor, or by any court of law or in arbitration, to in any way obligate or commit Lender to make Loans to Borrower, or to any third party on Borrower's behalf, or to amend, alter or in any way modify the discretionary nature of the lending relationship between Lender and Borrower. Borrower and each Guarantor recognize that the above provisions are essential, bargained-for covenants, which may not be waived or modified by Lender under any circumstance.

**FUNDING OF LOAN ADVANCES.** Lender may make the Loan proceeds available in the form of a check or draft payable to Borrower's order, or in the form of a direct EFT deposit into Borrower's designated deposit account with Borrower's bank. Lender additionally may elect to fund Loan Advances by making payments directly to each manufacturer, distributor or supplier of Financed Inventory and Equipment. Further, depending upon the circumstances, Lender may elect to make Loans in the form of purchases from the Borrower of accounts, chattel paper, electronic chattel paper, instruments, promissory notes, documents, general intangibles, payment intangibles, or extensions of credit previously extended by manufacturers, distributors or suppliers of Inventory or Equipment. Once purchased by Lender, each of the foregoing will, for all purposes, be considered a Loan subject to this Agreement.

**MANUFACTURERS, DISTRIBUTORS, SUPPLIERS NOT THIRD-PARTY BENEFICIARIES.** Lender shall have no liability to any manufacturer, distributor or supplier of goods purchased by Borrower. These entities are not third-party beneficiaries under this Agreement, and have no right to rely upon the willingness of Lender to make Loans or to issue commitments to make Loans to Borrower.

**PROMISE TO PAY.** Borrower unconditionally promises to pay to Lender the principal amount of each and every Loan that Lender may extend to Borrower and to others on Borrower's behalf, together with the principal amount of each and every Obligation that Borrower may incur in favor of Lender. Borrower additionally promises to pay interest to Lender computed on the principal balance of all outstanding Loans and Obligations, from the date of each Loan or the incurring of each Obligation, as applicable.

**INTEREST.** Interest will be assessed on Borrower's Loans and Obligations on a variable rate basis. The variable interest rates that will apply to Borrower's Loans and Obligations will be determined by application of one or more Interest Rate Factors to be added to a determined Variable Rate Index, which is subject to adjustment from time to time, one or more times, at such intervals as Lender may determine. The initial interest rate(s), Interest Rate Factor(s), and Variable Rate Index that will apply to Borrower's Loans and Obligations are set forth in Schedule 1 attached to and made a part of this Agreement.

Borrower recognizes and agrees that the Interest Rate Factors applicable to Borrower's Loans and Obligations are subject to change at Lender's sole option and discretion based upon a number of factors, including without limitation, Lender's transactional experience with Borrower. Lender will advise Borrower in writing of each change in the variable interest rate(s) applicable to Borrower's Loans and Obligations, whether resulting from periodic adjustments in the Variable Rate Index, or changes in the Interest Rate Factors in excess of the Variable Rate Index, as subsequently determined by Lender. To the extent required of the laws of any state or jurisdiction where Borrower is organized, located or conducts business, Borrower's

acknowledgment of receipt of each subsequent interest rate adjustment notice shall for all purposes affirm and evidence Borrower's unconditional agreement to pay interest to Lender at the rate or rates provided therein.

**INTEREST SAVINGS CLAUSE.** Under no circumstances will the rate of interest payable by Borrower be more than the maximum rate allowed by applicable law, it being Lender's intent to strictly comply with all laws relating to interest and usury. Accordingly, not withstanding any provision of this Agreement to the contrary, Borrower is not obligated to pay, nor will Lender accept payment of, interest in excess of that allowed by applicable law in any form and in any amount. Should Lender receive interest in excess of that allowed by applicable law, Lender may at its option refund the amount erroneously paid, or Lender may credit that amount to Borrower's then Obligations.

**EVIDENCE OF INDEBTEDNESS.** It is not necessary for Borrower to execute one or more promissory notes in favor of Lender to evidence Borrower's obligation to pay Loans and Obligations subject to this Agreement. Lender's internal records, including Lender's daily computer print-outs, shall serve for all purposes as conclusive evidence of the outstanding principal balance of all Loans and Obligations, as well as the amount of interest, fees and charges that may be owed to Lender at any time, and from time to time.

**PAYMENTS.** Borrower unconditionally promises to make payments to Lender as follows:

Interest Payments. Interest on all then outstanding Loans and Obligations is payable monthly, and is due immediately upon receipt of each monthly interest statement provided by Lender.

Principal Payments. Borrower agrees to pay Lender, immediately following the sale, lease or other disposition of each item of Borrower's Financed Inventory and Equipment, a sum equal to the Amount Financed attributable to that item. Borrower is obligated under all circumstances to make such principal reduction payments to Lender irrespective of whether the Net Sale or Lease Proceeds of any item of Financed Inventory or Equipment exceeds the Amount Financed for that item. Principal of all other Loans and Obligations of Borrower to Lender is payable immediately on demand by Lender.

Aged Inventory Pay-Down's. To the extent required by Lender, Borrower promises to make monthly principal reduction payments with respect to financed vehicles that are not sold or leased in the ordinary course of Borrower's business within the time period or periods that Lender may specify. These payments are due immediately on demand by Lender.

Form and Application of Payments. Borrower will mail, transmit, or deliver all payments to Lender at Lender's address shown above, or at such other place as Lender may designate in writing. All payments are to be made in U.S. dollars. Lender reserves the right, at any time and for any reason, to require that Borrower make payment by certified or cashier's check, or alternatively, in the form of electronic deposits in immediately available funds into Lender's designated deposit account. Lender may apply all sums received to the payment of principal, interest and other fees and charges on Borrower's then outstanding Loans and Obligations in such order and with such priority as Lender may determine within its sole and exclusive discretion.

**GRANT OF SECURITY INTEREST.** Borrower grants Lender a continuing security interest in the Collateral to secure the prompt and punctual payment and satisfaction of each and every Loan

and Obligation. Lender's security rights and interest will continue until all Loans and Obligations, including possible contingent Obligations, are fully paid and, satisfied and Lender elects to cancel and terminate its security interest in the manner provided in this Agreement. This is a continuing Security Agreement, which will continue in effect until canceled by Lender even though all or any part of Borrower's Obligations may be paid in full, and even though for a period of time Borrower may not be then obligated to Lender. To the extent that Borrower uses Advances to purchase some or all of the Collateral, all of the Loans and Obligations, including, without limitation, Advances used to purchase other Collateral or used for purposes unrelated to the purchase of any Collateral, shall be secured by the purchased Collateral.

**PERFECTION.** Lender may file whatever financing and continuation statements, amendments, and other documents, and Lender may take whatever additional actions Lender deems to be necessary and proper to perfect and continue perfection of Lender's security interest. To the extent that Lender may have previously filed a financing statement affecting any of the Collateral, Borrower ratifies and confirms Lender's authority to do so, and the contents and binding effectiveness of such a statement. Lender may file a carbon, photographic, facsimile, other reproduction, or electronically authenticated or maintained copy, of any financing statement or of this Agreement for use as a financing statement. Lender may make electronic filings of financing and other statements. All filings permitted under this section, including without limitation, electronic filings will be deemed to be complete and perfected for all purposes when made by Lender, and may be made by Lender without Borrower's consent and without the necessity that Borrower (or Lender on Borrower's behalf) sign any such financing statement or other perfection document. Borrower shall reimburse Lender for all expenses incurred with respect to perfection and continuation of the perfection of Lender's security interest. Without limitation of the generality of the foregoing: (a) to the extent that any of the Collateral is held by a third party (such as consignee or bailee) (i) notice of the security interest created by this Agreement in such Collateral shall be given to each such third party, and (ii) Borrower shall, upon the request of Lender, obtain and deliver to Lender a written and signed acknowledgement from each such third party that it is holding the Collateral for the benefit of Lender; (b) to the extent that any of the Collateral is comprised of deposit accounts or investment property, Borrower shall, upon the request of Lender (i) provide to Lender all consents, control agreements, and other agreements or instruments from third parties that are desirable or required by Lender to perfect Lender's security interest in such Collateral, and (ii) take all other actions, and obtain, execute and deliver such documents and instruments, as are desired or required by Lender to perfect Lender's security interest in such Collateral and give Lender control (as defined and described in the Code) of such Collateral; (c) to the extent that any of the Collateral is comprised of electronic chattel paper, Borrower will ensure that (i) there is only one identifiable authoritative copy of the electronic chattel paper record, (ii) the authoritative electronic chattel paper record for all electronic chattel paper in which Lender has a security interest will identify Lender as the first lien-holder, (iii) the authoritative electronic chattel paper record for all electronic chattel paper in which Lender has a security interest will be transferred to and maintained by Lender or a third party custodian designated by Lender, and (iv) changes or additions to the electronic chattel paper may not be made without the consent of Lender; (d) to the extent that any of the Collateral is comprised of types of Collateral that can be perfected by possession, or by either possession or filing, all such Collateral shall be delivered to Lender; and (e) Borrower agrees to execute any further documents, and to take any further actions, reasonably requested by Lender to evidence, perfect or protect the security interests granted herein or to effectuate the rights granted to Lender herein. Lender is

The following provision applies to Texas Borrowers only. The interest rates contracted for, charged, to be received, are limited by, and shall not exceed the applicable quarterly ceiling which is from time to time in effect under Chapter 303 of the Texas Finance Code, as amended, such quarterly ceiling to be adjusted on the first day of each calendar quarter. The parties elect not to be governed by Chapter 346 of the Texas Finance Code.

84-291-7258 (12/01)                          Page 3 of 13

authorized, at Borrower's cost and expense, to obtain all post-filing searches from all jurisdictions that Lender deems advisable to confirm the proper priority of all filings made by Lender under this Agreement.

**PROHIBITIONS REGARDING SECURED COLLATERAL.** So long as this Agreement remains in effect, Borrower shall not, without Lender's prior written consent:

A.  Sell, lease, assign, transfer, convey, option, mortgage, or grant any type of security interest on or with respect to any of the Collateral, except for statutorily created liens arising from taxes, worker's compensation claims and similar obligations that are not then due and payable, if such obligations are paid in full before any right to exercise or levy against such lien exists. However, Borrower may sell or lease items of its Inventory to bona fide unaffiliated third party purchasers and lessees in the ordinary course of Borrower's business; provided that Borrower promptly pays-over the sale or lease proceeds to Lender as required under this Agreement.

B.  License, title, and use any Collateral for any purpose not previously approved by Lender in writing.

C.  Permit any lien or encumbrance to be placed on or to attach to any of the Collateral, except as provided under clause A above. If requested by a Lender, Borrower will cause the owner or lessor of each building or other facility in or at which Borrower's Inventory and Equipment may be located, to provide Lender with a written waiver or subordination of any landlord's or other lien to which such a person or entity may be entitled.

D.  Do anything or permit anything to be done that would in any way impair Lender's security rights and interest with respect to the Collateral.

E.  Use any portion of the Collateral proceeds for any purpose other than to make payments to Lender or as otherwise permitted under this Agreement. Borrower's use of the Collateral proceeds for any other purpose without first obtaining Lender's written consent shall be in breach of this Agreement and of Borrower's fiduciary duties and obligations in favor of Lender, and shall constitute a prohibited "conversion" of Lender's Collateral.

F.  Remove or permit the removal of any of Borrower's Inventory or Equipment from the locations represented in Collateral Locations statements delivered pursuant to the "Affirmative Covenants" section set forth below for a period of thirty (30) days or longer to any location not previously approved by Lender in writing, or change the state in which any titled Collateral is titled.

G.  Permit any of Borrower's Equipment, other then Equipment that is customarily attached as a fixture, to be incorporated in or placed on the ground, or attached to any building or structure, so as to result in the Equipment becoming a fixture. If requested by Lender, Borrower agrees to cause the owner, lessor or mortgagee of the real property to provide Lender with a written waiver of any rights that party may have with respect to Borrower's Equipment.

Lender does not authorize any of the foregoing actions or activities.

**COVENANTS REGARDING COLLATERAL PROCEEDS.**

**Obligation to Pay-Over Collateral Proceeds to Lender; Trust Relationship.** Borrower shall promptly pay-over and deliver to Lender all proceeds (less any amounts that may be retained by Borrower as provided below), in any form, derived from the sale or lease of Borrower's Financed Inventory or Equipment, or in any way derived from any of Borrower's other Collateral. Once received by Borrower, such proceeds (whether in the form of checks, drafts, credit card drafts, or otherwise) shall be the property of Lender, and at all times while Borrower may hold such cash or cash-equivalent proceeds (whether directly or in the form of deposits in

Borrower's designated Operating Account, or in any other deposit account with any depository institution), Borrower shall do so "in trust" for and on behalf of Lender. Borrower intends that there be a true trust relationship between Borrower and Lender, with Borrower assuming full fiduciary duties, responsibilities, and obligations to and in favor of Lender.

**In-Kind Payments.** Lender may at its option, at any time and for any or no reason, with or without cause, require that Borrower pay-over and deliver to Lender the Collateral proceeds in the form received, including by way of example, delivery of third-party checks and drafts that are received by Borrower for purchases of Inventory, or arising out of purchases of chattel paper originated in connection with credit sales and leases of Borrower's Financed Inventory or Equipment.

**Additional Related Payments.** Borrower shall promptly pay to Lender an additional amount equal to the trade-in allowance or credit granted to the buyer or lessee of each purchased or leased vehicle (less any amounts that represent substitute Collateral proceeds for the purposes of this Agreement. Furthermore, should Borrower sell or lease a financed vehicle, and for any reason Borrower fails to receive the sale or lease proceeds within fourteen (14) days of delivery of the vehicle to the buyer or lessee, Borrower shall promptly pay to Lender an additional amount equal to the sale or lease proceeds Borrower would or should have received, together with the amount of any trade-in allowance or credit that may have been granted to the buyer or lessee.

**Lender's Consent to Permit Borrower to Retain a Portion of Collateral Proceeds.** Notwithstanding the other provisions of this "Covenants Regarding Collateral Proceeds" section, so long as no Event of Default exists under this Agreement, Borrower may retain for Borrower's use the difference between: (i) the Net Sale or Lease Proceeds derived from Borrower's sale, lease or other disposition of items of Borrower's Financed Inventory and Equipment; and (ii) the Amount Financed attributable to the purchase/acquisition of that item, which amount Borrower is obligated to pay immediately to Lender under the sub-section of this Agreement entitled "Principal Payments."

**BORROWER'S OPERATING ACCOUNT.**

**Borrower's Obligation to Deposit Collateral Proceeds in Operating Account.** Borrower has advised Lender in writing of the name and address of Borrower's depository bank, and the number of Borrower's Operating Account into which Borrower deposits Collateral proceeds on an interim basis before the Collateral proceeds are paid-over to Lender. So long as this Agreement remains in effect, Borrower shall deposit all Collateral proceeds (not paid-over directly to Lender in the form received) exclusively in Borrower's designated Operating Account and not in any other account with Borrower's existing bank or with any other bank or depository. Borrower shall immediately notify Lender in writing before Borrower obtains a loan or other credit (including overdraft credit) from Borrower's depository bank, and before Borrower opens or establishes a substitute or additional Operating Account.

**Lender's Security Rights in Funds Held on Deposit.** As additional security for the payment of Borrower's Loans and Obligations, Borrower grants Lender a continuing security agreement, and assigns to Lender any and all rights that Borrower may have to all funds now and in the future on deposit in Borrower's Operating Account that are derived from any source, whether or not such funds constitute Collateral proceeds. So long as no Event of Default exists, Borrower may continue to write checks on, make deposits into and withdrawals from Borrower's Operating Account in the ordinary course of Borrower's business, subject to Borrower's continuing obligation to make payments to Lender as provided in this Agreement. Lender will not unilaterally withdraw funds from the Operating Account in the absence of an Event of Default.

**Notice to Bank of Lender's Security Rights.** If and when requested by Lender, Borrower will notify its bank or other depository of Lender's security interest in funds on deposit in Borrower's Operating Account, and that certain funds on deposit are the property of, are held in trust for and on behalf of Lender. Should Borrower delay or fail for any reason to immediately comply with Lender's request, Lender may contact and so instruct the bank on Borrower's behalf.

**LOCK BOX.** Lender may, at any time after the occurrence of an Event of Default, require Borrower to institute procedures under which Collateral proceeds will be paid directly into a "lock box" account maintained with a bank or other depository designated by Lender. All or any portion of the Collateral proceeds received in such a lock box account may be, at Lender's sole election and discretion: (a) paid and turned over to Lender to be applied to Borrower's then Obligations; (c) paid and turned over to Lender to be retained as cash Collateral; or (d) any combination of the above as Lender may determine from time to time.

**DELIVERY OF VEHICLE CERTIFICATES OF ORIGIN AND TITLE.** Lender may, at any time after the occurrence of an Event of Default, and for any or no reason, with or without cause, require Borrower to deliver to Lender, or to Lender's designee, the certificate of origin with respect to each new vehicle, and the original certificate of title or registration with respect to each used, demonstrator, lease or rental vehicle, comprising part of Borrower's Inventory subject to this Agreement. Lender may retain physical possession of the certificates until such time as the particular vehicle is sold in the ordinary course of Borrower's business, and Borrower pays-over the Collateral proceeds to Lender.

**NOTICE TO ACCOUNT AND OTHER DEBTORS TO MAKE PAYMENTS DIRECTLY TO LENDER.** Lender may, at any time after the occurrence of an Event of Default, notify Borrower's account debtors and other payment obligors (including banks and other depositories) to make payment of amounts on which Lender has a security interest directly to Lender. This includes, but is not limited to, notice to manufacturers, distributors and suppliers of Borrower's Inventory and Equipment, who may be obligated to make any form of payment to Borrower, including without limitation, payment of what are known as "factory credits" or other incentive payments. Borrower unconditionally and irrevocably authorizes and instructs each of its account debtors and payment obligors to make payment directly to Lender as instructed. Lender may collect such payments and apply such amounts to Borrower's then outstanding Loans and Obligations, and/or Lender may retain such amounts as cash Collateral.

**POWER OF ATTORNEY.** Borrower irrevocably appoints Lender as its true and lawful attorney-in-fact, coupled with an interest, and with full power of substitution, for the purposes of accomplishing any and all of the following actions: (a) to file, and to the extent necessary, to sign Borrower's name on, any financing or continuation statement, or other documents that are necessary and proper to perfect, continue perfection, amend, or release Lender's security rights and interest; (b) to sign Borrower's name on any and all agreements or documents that are necessary and proper to carry out and enforce Lender's security rights and interests; (c) to notify manufacturers, distributors and suppliers of Borrower's Inventory and Equipment that they are authorized to accept payment from Lender for Inventory and Equipment that Lender may finance pursuant to this Agreement; (d) to sign Borrower's name on any motor vehicle bill of sale, or certificate of title or registration, or application or form submitted to a public agency; (e) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now and in the future become due, owing or payable from the Collateral; (f) to execute, sign and endorse Borrower's name to any and all claims, instruments, receipts, checks, drafts or warrants; (g) to settle or compromise any and all claims arising under the Collateral, and in Borrower's name and place, to execute and deliver a release and settlement for the claim; (h) to file any claim or claims or to take any action or institute or take part in any proceeding, either in Lender's own name or in Borrower's name; (i) to sign Borrower's name to any waiver of landlord's lien, and in Borrower's name, place and stead, to notify and obtain waivers of any landlord's lien with respect to any facility leased or rented by Borrower, or in or at which any of the Collateral may be kept or stored; (j) to sign Borrower's name to any notice of assignment of deposit account, and in Borrower's name, place and stead, to notify and obtain the concurrence of Borrower's depository bank; (k) to sign Borrower's name to any notice of assignment of factory credits and other payments, and in Borrower's name, place and stead, to notify and obtain the concurrence of manufacturers, distributors, and suppliers of Borrower's Inventory, Equipment and other Collateral; and (l) in Borrower's name, place and stead, to perform such acts as may be required of Borrower under this Agreement or under any Related Document, but which Borrower may not fully, or may refuse to perform for any or no reason, or that Borrower may delay in performing. Lender may take any and all of the above actions as Lender may deem to be necessary and proper within Lender's sole and exclusive discretion, and without any obligation to do so. Lender agrees that: (i) unless an Event of Default then exists (in which case no presentation of documents or instruments will be required under this clause (i)), Lender will not sign Borrower's name on any perfection document under clause (a) above, or exercise its rights under clauses (b), (d), (f), (i), (j) and (k) above, in each case, unless the applicable document or instrument signed by Lender has first been presented to Borrower for execution; and (ii) Lender will not exercise its rights under clauses (e), (g) and (h) above unless an Event of Default exists at the time of such exercise. This power of attorney is given as security for Borrower's Loans and Obligations, and the authority conferred on Lender is irrevocable and will remain in full force and effect until renounced by Lender in writing.

**PROTECTION OF LENDER'S SECURITY RIGHTS.** Borrower and each Guarantor are fully responsible for any and all losses Lender may suffer as a result of anyone other than Lender asserting any right to or interest in any of the Collateral. If and when requested by Lender, Borrower will appear in and defend all actions and proceedings purporting to affect Lender's security rights and interest. Should Borrower fail to do what is required of it under this Agreement, or if any action or proceeding is commenced or threatened naming Lender as a party, or affecting Lender's security rights and interest, then Lender may, without waiving any right or remedy that Lender may have, and without releasing Borrower or any Guarantor from any of their respective Obligations, do whatever Lender believes is necessary and proper within its sole discretion, including without limitation, advancing additional sums on Borrower's behalf, to protect the security of this Agreement.

**WAIVERS WITH RESPECT TO OBLIGATIONS.** Borrower and each Guarantor waive presentment for payment, protest and notice of protest and of non-payment, with respect to all Loans and Obligations subject to this Agreement. Discharge or release of any party or Collateral, or any modification of terms, or extension of time for payment, or any delay in enforcing any of Lender's rights and remedies, will not have the effect of releasing Borrower or any Guarantor from any of their respective Obligations, or cause Lender to lose any of its rights or remedies under this Agreement or otherwise. Borrower and each Guarantor additionally waive all defenses that may arise because of any action or inaction on the part of Lender, including without limitation, any failure or delay of Lender to exercise or enforce any of its rights and remedies.

**MULTIPLE BORROWERS.**

Additional Borrowers. Each Borrower and each Guarantor unconditionally agree that additional Affiliates of any Borrower may join-in this Agreement with Lender's consent as additional Borrowers. These additional Borrowers may express their intent and agreement to be subject to this Agreement by signing this Agreement's signature page, or under a separate letter agreement to be attached to this Agreement as an addendum. Such additional Borrowers may be added under this Agreement without the necessity of notice to, and without the necessity of obtaining the further consent of any other Borrower or Guarantor.

**Borrower Loans and Obligations.** Any Borrower may, at any time and from time to time, request and obtain Loans and incur Obligations in favor of Lender, again without the necessity of notice to, and without the necessity of obtaining the further consent of any other Borrower or Guarantor.

**Cross-Collateralization.** Unless otherwise agreed in writing, each Borrower's Collateral will secure all present and future Loans and Obligations of all other Borrowers.

**Cross-Default.** Unless otherwise agreed in writing, each Event of Default by any Borrower will be considered an Event of Default by all Borrowers.

**Cross-Guaranties.** Unless otherwise agreed in writing, each Borrower and each Guarantor jointly and severally guarantee on a continuing basis the prompt and punctual payment and satisfaction of all present and future Loans and Obligations of all Borrowers. Lender may file suit against, or otherwise seek to collect payment of all Loans and Obligations, from any Borrower or from any Guarantor without the necessity of Lender first seeking to collect payment from the borrowing Borrower, or any other Borrower, Guarantor or other party that may be liable for the Loans or Obligations, and without the necessity that Lender first seek to exercise against the Collateral.

**Unlimited Continuing Guaranty.** Each Borrower's guarantee of all Loans and Obligations of all other Borrowers shall be unlimited (meaning that there is no maximum limitation on the amount that each Borrower is guaranteeing), and continuous (meaning that Borrower's guaranty will continue in effect even though all or a part of another Borrower's Obligations may be paid in full, and even though for a period of time no other Borrower may then be obligated to Lender).

**Payment Obligations.** If and when Lender makes demand, each Borrower agrees to immediately pay Lender all amounts that the guaranteeing Borrower may then owe under its guaranty, including all then outstanding Obligations of all other Borrowers, in principal, interest, costs, expenses, attorneys' fees and other fees and charges.

**Joint and Several Liability.** Each Borrower's guarantee obligations and liability to Lender for the Obligations of all other Borrowers shall be those of a primary obligated party, rather than those of a surety, with each Borrower being jointly and severally liable to Lender for all Obligations of all other Borrowers.

**Subordination.** So long as any Obligation of any Borrower remains outstanding, all rights that Lender may have against any Borrower, and its properties and assets, at all times shall be superior to any rights that any Borrower may have to receive payment from any other Borrower (other than for bona fide inter-company purchases of goods or services, and for such other purposes as Lender may agree to within its sole discretion).

**REPRESENTATIONS AND WARRANTIES.** Borrower represents, warrants and certifies to Lender, as of the date of this Agreement, and as of the date of each Advance, and at all times while any Obligation exists, that:

**Organization and Licensing.** Borrower is duly organized, validly existing, and is qualified and fully licensed to do business, and is in good standing in each jurisdiction where the nature of Borrower's business requires Borrower to be qualified or licensed.

**Authorization.** Borrower's execution, delivery and performance of this Agreement and of each Related Document have been duly authorized, and do not conflict with, and will not result in a breach of Borrower's governing agreements, or any other agreement or instrument which may be binding upon Borrower, and will not violate any law or governmental regulation or court decree or order applicable to

Borrower or its properties. Borrower has the power and authority to enter into Loans and to grant a security interest in the Collateral in favor of Lender.

**Financial Statements.** All balance sheets, statements of profit and loss, and other financial data, which have been or will be furnished by Borrower to Lender, or to other persons or entities, fairly present the financial condition of Borrower's business as of the date or dates stated, and the results of Borrower's operations for the periods for which the same are furnished. There has been no change in the business, earnings, prospects, assets, liabilities, or condition (financial or otherwise) of Borrower from that set forth in the most recent financial statements furnished by Borrower to Lender other than changes in the ordinary course of Borrower's business, none of which changes have been materially adverse. All other information, reports, papers and data furnished by or to be furnished by Borrower, or its representatives, to Lender, or to other persons or entities, are and will be accurate and correct in all material respects, and complete insofar as a completeness may be necessary to give Lender a true and accurate knowledge of the subject matter. Unless Lender otherwise agrees in writing, all financial statements are and will be prepared in accordance with generally accepted accounting principles.

**Litigation.** Other than as previously disclosed to Lender in writing, there is no litigation or legal, administrative or tax proceedings, investigations or other action or matters pending, or to the knowledge of Borrower, threatened against or affecting Borrower, or any Guarantor, or their properties or assets, the outcome of which in the opinion of counsel to Borrower, and of Borrower's officers, managers or principals, could have a material adverse affect on Borrower's or Guarantor's financial condition or business.

**Information.** All additional information previously provided and to be provided in the future to Lender by Borrower and by each Guarantor for the purposes of or in connection with this Agreement, or any Loan, or other transaction between the parties, is and will continue to be true and accurate in every material respect, and none of the information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading.

**Properties.** Other than previously disclosed to Lender in writing, Borrower (a) owns, has good title to and/or has the right and power to transfer the Collateral and (b) owns and has title to all of Borrower's other properties and assets, in each case, free and clear of all security interests, liens and encumbrances, and Borrower has not executed or agreed to any security documents or financing statements relating to the Collateral or Borrower's other properties. To the extent applicable, the Collateral and all of Borrower's other properties are titled in Borrower's legal name, and Borrower has not changed its legal name, or merged with or into another entity, within the immediately preceding five (5) years.

**First Priority Security Interest.** Unless Lender otherwise agrees in writing, and subject to the filing of financing statements in all proper locations and the filing of continuation statements when and to the extent required by the Code, Lender has and will continue to have a first priority security interest in all of the Collateral.

**Enforceability of Collateral.** To the extent that the Collateral consists of investment property, accounts, chattel paper, electronic chattel paper, general intangibles, payment intangibles, documents, instruments, promissory notes, or supporting obligations, the Collateral is enforceable in accordance with its terms, is genuine and complies with all applicable laws concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract, and are in fact obligated as they appear to be on the Collateral.

Taxes. To the best of Borrower's knowledge, all tax returns and reports of Borrower that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently or to be contested in good faith for which adequate reserves have been provided.

Binding Effect. This Agreement and all Related Documents are valid and binding upon Borrower and each Guarantor, and are legally enforceable in accordance with their terms.

No Event of Default. No Event of Default exists under this Agreement or under any Related Document, and no event exists which with the lapse of time and failure to cure would become an Event of Default.

Commercial Loan and Collateral. The Loans and Obligations are being incurred for commercial purposes and are not a "consumer transaction" or a "consumer-goods transaction" (both as described and defined in the Code). Advances will be used only for commercial purposes and not consumer purposes. All of the Collateral is, has been or will be used, acquired or held for commercial purposes and does not constitute "consumer goods" (as described and defined in the Code). The Collateral is not now, and never will be, used for agricultural purposes.

Location and Name of Borrower. The location of each Borrower's (a) residence, if such Borrower is an individual or sole proprietorship, or (b) principal place of business, if such Borrower is a business entity that is created without any state filings, is recited in the address of each Borrower following its signature to this Agreement or any Addendum or other writing adding such Borrower as a Borrower under this Agreement. The exact legal name of each Borrower is the name indicated in the signature block for each Borrower at the end of this Agreement, or in any Addendum or other writing adding such Borrower as a Borrower under this Agreement. Each Borrower is a duly organized entity of the type described in, and each Borrower's state of organization is the state recited in, the signature block for the Borrower at the end of this Agreement or any Addendum or other writing adding such Borrower as a Borrower under this Agreement.

SURVIVAL OF REPRESENTATIONS AND WARRANTIES. Lender, without independent investigation, is relying, and will continue to rely upon the above representations and warranties in extending Loans to Borrower. The above representations and warranties will remain in full force and effect until such time as all Obligations (including potential contingent Obligations) are fully paid and satisfied.

AFFIRMATIVE COVENANTS. So long as this Agreement remains in effect, Borrower (and each Borrower if there is more than one) shall:

Performance; Notice of Default. Perform and comply with all terms, conditions and provisions of this Agreement and each Related Document, and promptly notify Lender if Borrower knows or has reason to know of any event that may constitute or give rise to an Event of Default.

Business Operations. Conduct its business affairs in a reasonable and prudent manner, and in compliance with all applicable federal, state and municipal laws, ordinances, rules and regulations.

Licenses, Franchises and Authorizations. Maintain all licenses, franchises, and authorizations that may be necessary or required for Borrower to continue its business operations as now and in the future conducted.

Employee Benefit Plans. Maintain each employee benefit plan as to which Borrower may have any liability, in compliance with all applicable law and regulations.

Financial Records. Maintain financial and accounting records in accordance with generally accepted accounting principles

(unless Lender otherwise agrees in writing to some other standard). If and when requested by Lender, Borrower shall provide Lender with certified financial statements in form and containing such information as Lender may require within its sole discretion. Unless and until certified financial statement are specifically requested by Lender, uncertified signed financial statements will be accepted.

Insurance. Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to the Collateral, Borrower's other properties and business operations, in form, amounts, coverages, and with such insurance companies that are reasonably acceptable to Lender. If requested by Lender, Borrower shall deliver to Lender from time to time policies or certificates of insurance in a form satisfactory to Lender, including stipulations that coverages will not be canceled or diminished without at least thirty (30) days prior written notice to Lender. In connection with all policies of insurance covering assets in which Lender holds or is offered a security interest, Borrower shall provide Lender with such lender's loss payable and other endorsements as Lender may require. Each insurance policy must include an endorsement providing that loss payable coverage in favor of Lender will not be impaired in any way by any act, omission or default by Borrower or any other person.

Insurance Reports. Furnish Lender with reports on each existing policy of insurance showing such information as Lender may reasonably request, including without limitation: (a) the name of the insurer; (b) the risks of insured; (c) the amount of the policy; (d) the property insured; (e) the then current value or the basis on which insurance has been obtained and the manner in determining that value; and (f) the policy expiration date.

Required Capitalization and Financial Ratios. Maintain minimum capitalization, minimum net worth, and other financial ratios to such amounts and within such percentages as may be acceptable to Lender.

Examination. Permit Lender to examine, audit and copy Borrower's books, records, ledgers, computer files and programs at all reasonable times, and answer all questions and inquiries, and provide Lender with such additional documentation as Lender may request.

Inspection. Permit Lender's employees and agents to inspect the Collateral and Borrower's other properties, wherever they are located, at any reasonable time.

Collateral Locations. Deliver to Lender a schedule of real properties and Collateral locations relating to Borrower's business operations, including without limitation, a schedule of all: (a) real property owned or being purchased by Borrower; (b) real property being rented or leased by Borrower; (c) storage facilities owned, rented, leased or being used by Borrower; and (d) other properties where any of the Collateral is or may be located.

Change in Borrower's Business Locations. Immediately notify Lender in writing of any change in location of any Borrower's (a) residence, if such Borrower is an individual or sole proprietorship, (b) principal place of business, if such Borrower is a business entity that is created without any state filings, or (c) state of organization, if such Borrower is a business entity that is created by state filings; Borrower will additionally notify Lender immediately in writing of any change in the location where Borrower's books and records are kept, or in the location where Borrower's Inventory or Equipment may be kept or otherwise found or titled.

Collateral Schedules. Deliver to Lender such lists, descriptions, and designations of the Collateral as Lender may require to identify the nature, extent, and location of each Collateral item.

**Inventory Aging Schedules.** Deliver to Lender agings of Borrower's Financed Inventory at such intervals and in such form and containing such information as Lender may require within its sole discretion.

**Change in Name; Tax Identification Number; Etc.** Immediately notify Lender in writing of any change in Borrower's name, or any change in any assumed business or trade name under which Borrower conducts business, or of any change in Borrower's federal tax/employer identification number, or should Borrower change its type of business entity (e.g., convert from a corporation or partnership into a limited liability company), or should Borrower merge with or into, or acquire the assets of another entity.

**Sale or Lease of Financed Inventory and Equipment.** Immediately notify Lender in writing of the sale, lease or other disposition of each item of Borrower's Financed Inventory and Equipment.

**Completion of Sale or Lease.** Promptly take whatever actions and make whatever filings are necessary to complete the sale, lease or other disposition of each item of Financed Inventory, including without limitation, filing appropriate forms to complete titling and licensing of each purchased or leased vehicle, and paying required fees and taxes to the appropriate public officials.

**Titling of Financed Vehicles.** Immediately notify Lender should Borrower apply for and obtain a vehicle certificate of title with respect to a vehicle included in Borrower's Financed Inventory or Equipment, including without limitation, vehicles acquired under Lender's Daily Rent-A-Car ("DRAC") program. Borrower shall sign whatever additional documents (or permit Lender to do so under Borrower's power of attorney) as may be necessary and proper in Lender's sole discretion to complete perfection of Lender's security rights and interest with respect to the titled vehicle.

**Other Notifications.** Immediately notify Lender of all cases involving the return, rejection, repossession, loss or damage of any of the Collateral, of any request for credit or adjustment, and/or of any other dispute arising with respect to the Collateral, and generally of all happenings or events in any way affecting the Collateral or its value.

**Financial Information.** Provide Lender with such financial information and statements (including monthly balance sheet and profit and loss statements), audit reports, management letters, lists of assets and liabilities, agings of receivables and payables, budgets, forecasts, projected cash flow statements, and such other reports with respect to Borrower's financial condition and business operations at such intervals and in such detail as Lender may request. Borrower additionally shall provide Lender, as soon as possible, but no later than one hundred eighty (180) days after the end of each fiscal year, with copies of Borrower's federal, state, and local tax returns.

**Public Filings.** Provide Lender with copies of all public filings that Borrower may make to federal and state regulatory agencies, and/or to Borrower's shareholders, partners or members.

**Financial Condition.** Promptly inform Lender in writing of (a) all material adverse changes in Borrower's and/or each Guarantor's financial condition, and (b) all existing and threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor, which could materially affect Borrower's or Guarantor's financial condition or business.

**Lease, Rental and Mortgage Payments.** Pay promptly when due all lease, rental and mortgage payments affecting the properties where Borrower conducts business, or otherwise where Borrower's Inventory and Equipment are stored or may be found. If and when requested by Lender, Borrower shall provide Lender with evidence that Borrower has timely complied with the requirements of this provision.

**Taxes.** Pay promptly when due all taxes, governmental assessments and other fees and charges applicable to Borrower, its business operations, properties and assets, and in any way related to sales or leases of Inventory and Equipment. If and when requested by Lender, Borrower shall provide Lender with evidence that Borrower has timely complied with the requirements of this provision.

**Other Payments.** Pay promptly when due all contractual obligations calling for the payment of money, and all claims, assessments and charges which constitute, or, if unpaid, may become a lien, charge or encumbrance upon Borrower's business or any of Borrower's properties or assets.

**Instructions to Manufacturers, Distributors and Suppliers.** Instruct each manufacturer, distributor and supplier of Borrower's Financed Inventory and Equipment to respond to direct inquiries and requests for information from Lender with respect to any and all matters and transactions involving Borrower or its Affiliates. Borrower waives all rights of confidentiality and privacy and instructs its manufacturers, distributors and suppliers to provide Lender with whatever information and schedules Lender may request.

**Instructions to Account and Other Debtors.** Instruct each of Borrower's account debtors and other payment obligors with respect to any of the Collateral to respond to direct inquiries and requests for information from Lender with respect to any and all matters and transactions involving Borrower or its Affiliates. Borrower waives all rights of confidentiality and privacy and instructs its account debtors and other payment obligors to provide Lender with whatever information and schedules Lender may request.

**NEGATIVE COVENANTS.** So long as this Agreement remains in effect, Borrower and its principal owners will not, without Lender's prior written consent:

**Continuity of Operations.** (a) Engage in any business activity substantially different from those in which Borrower is presently engaged; (b) cease operations; (c) liquidate, merge, transfer, acquire or consolidate with any other entity; (d) permit any change to take place in the controlling ownership of Borrower; (e) change its name or any assumed business or trade name under which Borrower operates; (f) dissolve or transfer any of Borrower's properties or assets other than in the ordinary course of Borrower's business; (g) change the location of any Borrower's (i) residence, if such Borrower is an individual or sole proprietorship, (ii) principal place of business, if such Borrower is a business entity that is created without any state filings, or (iii) state of organization, if such Borrower is a business entity that is created by state filings; (h) change Borrower's legal structure; (i) alter or amend Borrower's capital structure; (j) make any substantial disbursement or use of Borrower's funds except in the ordinary course of Borrower's business; (k) guaranty or become surety for the obligations of others; or (l) permit any of the foregoing persons to withdraw money from Borrower's business in any manner other than in a normal and usual course of Borrower's business.

**Sales and Management Agreements.** Enter into an agreement with one or more individuals or entities: (a) to sell/purchase or acquire in any form and in the aggregate, more than ten (10%) percent of the equity ownership of Borrower; or (b) over any period of time, to sell or otherwise transfer (other than in the ordinary course of Borrower's business) more than twenty (20%) percent of Borrower's assets; or (c) to assume or take-over the operations and management of Borrower's business in any significant respect.

**Prohibited Overdrafts.** Overdraw, or otherwise write checks on Borrower's Operating Account when there is insufficient collected funds on deposit in the Account to pay checks when presented.

**ADDITIONAL PROTECTIVE ADVANCES.** Should Borrower for any reason fail to do what is required of it under this Agreement, or otherwise, Lender may, at its sole option and

discretion, and without any obligation to do so, take whatever actions on Borrower's behalf as Lender may deem to be necessary and proper to permit Lender to obtain full recovery and payment of all Obligations. Specifically, but without limitation, Lender may: (a) purchase and maintain insurance on the Collateral and Borrower's other properties and assets, and with respect to Borrower's business operations; (b) pay taxes and governmental assessments on Borrower's behalf; and (c) compromise or otherwise satisfy any claim that a third party may assert against the Collateral, or against Borrower or its property. All additional sums that Lender may advance for such purposes, together with interest at the rate or rates then applicable to Borrower's Loans, will be considered as additional Obligations subject to and secured by this Agreement.

ADDITIONAL DOCUMENTS.

Certificates. If and when requested by Lender, Borrower shall periodically provide Lender with a certificate signed by Borrower's principal or executive officer, certifying that, as of the date of each certification, all the representations and warranties set forth in this Agreement and in all Related Documents are and remain true and correct, and further certifying that no Event of Default then exists under this Agreement or under any Related Document.

Opinion of Counsel. If requested by Lender, Borrower shall provide the Lender with an opinion of Borrower's counsel certifying that: (a) Borrower validly exists, and has qualified to do business and is in good standing in each jurisdiction in which Borrower is required to do so; (b) Borrower has obtained all licenses necessary to conduct its business; (c) Borrower has authority to enter into this Agreement and each Related Document; (d) this Agreement and each Related Document constitute and give rise to legal, valid, and binding obligations on the part of Borrower that are enforceable in accordance with their respective terms; and (e) such other matters as may be requested by Lender and by Lender's counsel.

EVENTS OF DEFAULT.   The following are Events of Default under this Agreement:

Payment Default. Should Borrower fail to make any payment of principal or interest as provided in this Agreement when due.

Other Defaults.   Should Borrower fail to comply with or perform under any term or condition of this Agreement or any Related Document.

Defaults in Favor of Other Creditors. Should Borrower default under any material loan, indebtedness, obligation, or agreement in favor of any other person or entity, in any way related to the conduct of Borrower's business.

Creditor Proceedings. Should any other creditor attempt to take or exercise against any of the Collateral, or against any of Borrower's or any Guarantor's other property or assets.

Filing of a Tax Lien. Should a tax lien or notice of tax lien be filed against Borrower or against any of its property or assets.

Termination of Franchise.   Should any manufacturer, distributor, or supplier of Borrower's new vehicle inventory for any reason terminate Borrower's franchise or other rights to operate as an authorized dealer.

Defective Collateralization. Should Lender for any reason not acquire or ever cease to have a first priority security interest in the Collateral.

Insolvency. Should Borrower or any Guarantor become insolvent, or apply for bankruptcy or other relief from creditors.

Withdrawal of Guaranty. Should any Guarantor withdraw its guaranty.

Guarantor's Death. Should any Guarantor die.

False Statements. Should any representation, warranty or statement made to Lender under this Agreement, or under any Related Document, or in connection with any Loan or Obligation, prove to be false or misleading in any material respect.

Adverse Change. Should there be a material adverse change in Borrower's or any Guarantor's financial condition, or should Lender reasonably believe the prospect of Borrower's payment or performance to be impaired.

Insecurity. Should Lender reasonably deem itself insecure with regard to payment of any Obligation, or should Lender reasonably believe that any of the Collateral is in danger of misuse, loss, seizure or confiscation, or other disposition not authorized under this Agreement.

LENDER'S RIGHTS AND REMEDIES IN EVENT OF DEFAULT. Lender shall have the following rights and remedies only after the occurrence of any Event of Default:

Security Rights and Remedies. Lender shall have all of the rights and remedies available to a secured party generally under the Code and under the laws of each state or jurisdiction where the Collateral may be located at the time of or following the occurrence of an Event of Default.

Right to Demand Payment.   Lender may demand immediate payment in full of all Loans and Obligations, including principal, interest, costs, expenses, attorneys' fees and other fees and charges.

Right to Appoint Keeper. Lender may, without the necessity of first bringing an action or proceeding against Borrower before a court of competent jurisdiction, appoint a keeper to take the following actions: (a) to enter the premises and other locations where Borrower conducts business, and to remain on premises for such time as the keeper may deem necessary and appropriate; (b) to take constructive or actual possession and control over Borrower's Financed Inventory and Equipment and other Collateral; (c) to take possession and control over certificates of origin and title with respect to each vehicle comprising part of Borrower's Inventory; (d) to take constructive or actual possession and control over all documents, books, records, papers, accounts, chattel paper, electronic chattel paper, instruments, promissory notes, general intangibles, payment intangibles, supporting obligations, contract rights, software or any similar types of tangible or intangible property relating to or comprising part of the Collateral; (e) to receive payment of all Collateral proceeds; and/or (f) to take whatever additional actions the keeper may deem within his sole judgment and discretion to be necessary and proper to protect and preserve the Collateral, and to carry out, and to protect and preserve Lender's security rights and remedies. The keeper need not be independent, and may be an officer or employee of Lender. The keeper shall have no fiduciary duty or obligation to Borrower or to any Guarantor. Borrower shall fully cooperate with the keeper and shall provide the keeper with such offices and other facilities as the keeper may reasonably request. Borrower shall pay the reasonable fees of the keeper, which Obligation shall be secured by this Agreement. Lender's appointment of a keeper shall not impair or in any way prejudice the rights of Lender to exercise any of its security rights and remedies as provided under this Agreement, or under any Related Document, or under applicable law.

Right to Collect Payments. Lender may collect and enforce payment of all accounts, general intangibles, payment intangibles, chattel paper, electronic chattel paper, instruments, promissory notes, documents, supporting obligations, contract rights or any similar types of tangible or intangible property that may be included in the Collateral, and may instruct each obligated person or entity to make payment directly to Lender.

**Right to Take Possession of Collateral.** Lender may take possession of the Collateral wherever located, even if the Collateral is then in the possession of a third party. Immediately following Lender's demand, Borrower shall deliver, or cause to be delivered, to Lender or its designee all Collateral then in Borrower's possession, or in the possession of any third-party over which Borrower may exercise control. Borrower shall further deliver or cause to be delivered to Lender all books, records, files, computer disks and software in any way relating to the Collateral. If and when requested by Lender, Borrower shall assemble the Collateral and make it available to Lender at a place or at such places as Lender may designate. Lender may enter upon Borrower's property, or the property of a third party where any of the Collateral may then be located, and take possession of and remove the Collateral.

**Right to Sell Collateral at Public or Private Sale.** Lender may sell all or any part of the Collateral at one or more public or private sales at any time Lender may elect, without the necessity of filing suit against Borrower or against any Guarantor, and without the necessity of additional demand for payment or appraisal. Unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market, Lender will give or mail Borrower and each Guarantor notice at least ten (10) days in advance of a time and place of public sale, or the date after which private sale may take place. Any requirement of reasonable notice shall be satisfied if Lender mails notice by ordinary mail addressed to the last address of Borrower and Guarantor appearing in Lender's records. If public sale is held, there shall be sufficient compliance with all requirements of notice to the public by a single publication in any newspaper of general circulation in the county where the Collateral is to be sold. The notice will set forth the time and place of sale and a brief description of the Collateral to be sold. Sale of the Collateral at a dealer auction shall be deemed to be a private sale for all purposes. Any public or private sale of Collateral shall be conclusively deemed to be conducted in a commercially reasonable manner if it is made consistent with the standard of similar sales of collateral by commercial lenders. Furthermore, any private sale of Collateral to the manufacturer, distributor or supplier of such goods pursuant to pre-existing agreement or statutory requirement, shall be conclusively deemed to be conducted in a commercially reasonable manner for all purposes. Lender has no obligation to clean-up or otherwise prepare the Collateral for any sale and may, upon any sale of the Collateral, specifically disclaim any warranties of title or fitness or any similar warranties. Lender may comply with any applicable state or federal law requirements in connection with the Collateral and the disposition or sale thereof and such compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

**Sales on Credit.** If Lender sells any of the Collateral upon credit, the Loans and Obligations will be credited only with payments actually made by the purchaser of the Collateral that are received by Lender and applied to the Loans and Obligations of the purchaser to Lender in connection with the sale of the Collateral. In the event the purchaser fails to pay for the Collateral, Lender may resell the Collateral and no portion of the unpaid sales price to purchaser will be credited against the Loans or the Obligations.

**Strict Foreclosure.** Borrower acknowledges and agrees that: (a) some or all of the Collateral may be retained by Lender in either full or partial satisfaction of the Loans and Obligations, as determined by Lender; (b) Borrower will remain liable to Lender for any deficiency amount remaining after crediting against the Loans and Obligations the value received by Lender as a result of the Collateral that was so retained; and (c) repossession of some or all of the Collateral by Lender shall not constitute a retention of the Collateral in either full or partial satisfaction of the Loans and Obligations unless Lender notifies Borrower in writing that Lender is retaining some or all of the Collateral in partial or full satisfaction of the Loans and Obligations.

**Right to Cancel Purchases of Inventory and Equipment; Return of Goods.** Lender may require Borrower to, or Lender may in Borrower's stead, notify the manufacturer, distributor or supplier of Borrower's Financed Inventory and/or Equipment in order to cancel any purchase or purchases, and when appropriate and permitted, to return the purchased goods for credit. To the extent that Borrower has previously paid the manufacturer, distributor or supplier for the returned goods, Lender may direct the manufacturer, distributor or supplier to make appropriate payment directly to Lender to be applied at Lender's option against Borrower's then outstanding Obligations, or held as additional cash Collateral.

**Application of Proceeds.** All proceeds derived from the collection, sale, or other disposition of the Collateral will be applied: (a) first to reimbursement of all expenses incurred by Lender in exercising and enforcing its security rights and remedies, including without limitation, reimbursement of Lender's reasonable attorneys' fees, court costs, sheriff's commissions and fees, and keeper fees; and (b) then to the payment of Borrower's Loans and Obligations in such order and with such priorities as Lender may determine within its sole discretion. Borrower shall reimburse Lender for all of its expenses in exercising and enforcing its security rights (again including without limitation, Lender's reasonable attorney's fees of both in-house and outside counsel), which amounts are additional Obligations secured by the Collateral.

**Right of Set-Off.** Lender may set-off and apply any and all credits, monies, or properties of Borrower in Lender's possession or control, against any Obligations then owed to Borrower to Lender.

**Specific Performance.** Lender may file suit against Borrower and each Guarantor before a court of competent jurisdiction seeking specific performance of Borrower's and Guarantor's agreements, covenants, and Obligations in favor of Lender.

**Cumulative Remedies.** All of Lender's rights and remedies, whether under this Agreement or under any Related Document, or under applicable law, are cumulative and may be exercised singularly or concurrently. Lender's election to pursue any particular remedy will not preclude Lender from pursuing any other remedy. Furthermore, Lender's election to make expenditure or to take any action to perform an obligation of Borrower under this Agreement, or otherwise, after Borrower's failure to do so, will not affect Lender's right to declare an Event of Default to exist, or otherwise preclude Lender from exercising any of its rights or remedies.

**Electronic Actions.** All rights and remedies of Lender under this Agreement may be performed and accomplished electronically to the extent otherwise permitted by applicable law, including, without limitation, electronic filings, electronic notices, electronic accountings and electronic enforcement, collection, realization and foreclosure activities.

**INDEMNIFICATION OF LENDER.** Borrower and each Guarantor shall indemnify, defend and save and hold Lender, its parent, subsidiaries and affiliated companies, and their officers and directors, and employees, agents, and attorneys, harmless from any and all claims, suits, obligations, damages, losses, costs and expenses (including without limitation, Lender's legal costs and expenses for both in-house and outside counsel), demands, liabilities, penalties, fines and forfeitures, arising out of or in anyway occasioned by this Agreement, and any Loan or Obligation, or other relationship between the parties.

**TERMINATION OF ADDITIONAL BORROWINGS.**

**Termination by Borrower.** Borrower may, at any time and for any or no reason, advise Lender in writing that Borrower will no longer request Lender to make additional Loans under this Agreement. (If there is more than one Borrower, that Borrower may terminate future borrowings only with respect to itself, and not with respect to additional Borrowers subject to this Agreement.) At the time of sending this notice, Borrower shall immediately pay to Lender all Loans and

Obligations then outstanding, including principal, interest, cost, expenses, attorneys' fees and other fees and charges.

**Termination by Lender.** Lender may, at any time (whether or not an Event of Default then exists), and for any or no reason, with or without cause, terminate the ability of Borrower (or any Borrower) to request and obtain additional Loans under this Agreement, or otherwise. Should Lender terminate future borrowings under this Agreement, Lender may demand immediate payment of all then outstanding Loans and Obligations, including principal, interest, costs, expenses, attorneys' fees and charges, which amounts Borrower shall pay immediately.

**Cancellation of Lender's Security Rights and Interest.** Lender will have no obligation whatsoever to cancel or otherwise terminate its continuing security rights and interest under this Agreement, or the continuing Obligations of each Guarantor under their respective guaranties, unless and until Lender is completely satisfied that all Loans and Obligations (including possible contingent Obligations) have been fully paid and satisfied. Only then may Lender agree to cancel and release its security interest from the public records, and to release each Guarantor from their respective Obligations.

**ELECTRONIC FUNDS TRANSFER (EFT) AND NATIONAL AUTOMATED CLEARING HOUSE (NACHA) AUTHORIZATION.**

Borrower authorizes Lender to present National Automated Clearing House transactions (ACH debits and ACH credits), wire transfer credits and debits, and depository transfer checks of Borrower's designated depository bank and account. Borrower agrees that the National Clearing House Association ("NACHA") Operating Rules and the Operating Guidelines of the Chase Automated Clearing House, Inc. will govern electronic funds transfers ("EFT" transactions) generated or requested by Borrower's authorized representatives. ACH transactions presented to Borrower's designated bank will be originated from the Chase Manhattan Bank, N.A., or a substitute provider bank. In the absence of an ACH debit, a depository transfer check transaction may originate from the provider bank, bearing their general endorsement. Borrower originated financial transactions processed within the scope of this Agreement will be administered daily by Lender through the DaimlerChrysler Corporation DIAL System, and its associated networks. From time to time, these networks may experience brief interruptions, for which redundant backup systems exist to minimize downtime. Borrower recognizes and agrees that no operating guarantees are presented or implied with respect to this authorization, or the continuing services and applications represented in the Users Manual provided by Lender.

This EFT and NACHA authorization shall remain in full force and effect until such time as either Borrower or Lender gives written notice to the other as provided in this Agreement.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are part of this Agreement:

   **Binding Effect.** This Agreement is binding upon and shall inure to the benefit of the executors, administrators, legal representatives, successors and assigns of the parties.

   **Amendment and Replacement of Prior Agreements.** This Agreement amends, supplements and replaces all prior agreements and written and verbal understandings between the parties with respect to all matters discussed in or relating to this Agreement. To the extent that any prior Related Document is not replaced with a new Related Document, the prior Related Document will remain in full force and effect. All financing statements now in effect and in any way related to the Collateral will remain in full force and effect until terminated by Lender.

   **Amendments to This Agreement.** No term or provision of this Agreement will be deemed to be altered or amended in any way unless such an amendment or alteration is contained in a separate written instrument signed by both Borrower and

Lender. No conduct or course of dealing on the part of Lender, or any oral statement on the part of Lender's officers, employees, agents, or attorneys, may be construed by Borrower, or by Borrower's owners, principals or management officials, or by any Guarantor, or by any court of law or in arbitration, to amend, alter or in any way modify the provisions of this Agreement, or the relationship of the parties, or the obligation of any party to any other person or entity.

   **Multiple Counterparts.** This Agreement may be executed in multiple counterparts, any one of which will be deemed an original for all purposes.

   **Electronic Storage; Reproduction Deemed an Original.** Lender may electronically store and preserve this Agreement and all Related Documents, and discard and otherwise destroy the original signed document(s). Any reproduction of this Agreement or of a Related Document derived from Lender's electronic storage system will be deemed to be original and authentic, and may serve in the place of the original signed document for all purposes.

   **Applicable Law.** This Agreement, each Related Document and the relationships of the parties are subject to, and are to be construed in accordance with the laws of the state in which a plurality of the Borrowers have their principal place of business, regardless of the conflict of law rules of that state, as though fully incorporated herein.

   **Captioned Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

   **Legal Costs and Expenses.** Borrower shall reimburse Lender for all of Lender's reasonable legal costs and expenses incurred in connection with the preparation, execution, modification, enforcement, and collection of this Agreement or any Related Document, and of all Loan or Obligations subject hereto; provided that if the Borrower signs Lender's form documents without modification, there will be no costs or charges paid by Borrower in connection with the preparation and execution of those documents. Specifically, but without limitation Borrower shall reimburse Lender for Lender's reasonable legal costs and expenses incurred in connection with negotiations with Borrower, and any Guarantor, and with respect to negotiation of any work-out agreement between the parties, whether or not a lawsuit is filed or arbitration commenced, and further including Lender's reasonable legal costs and expenses incurred in any bankruptcy proceeding (including efforts to modify or vacate any automatic stay or injunction), or on appeal, and for anticipated post-judgment collection services. Legal costs include fees and costs of both in-house and outside legal counsel.

   **Notices.** To give Borrower or any Guarantor any notice under this Agreement, or under a Related Document, Lender may hand deliver or mail the notice to Borrower's or the Guarantor's current address found in Lender's files and records. If there is more than one Borrower or Guarantor, notice to any Borrower or Guarantor will be considered notice to all Borrowers and Guarantors. To give Lender any notice under this Agreement, Borrower or Guarantor must mail the notice to Lender by registered or certified mail to Lender's address specified by this Agreement, or to any other address that Lender may specify. All notices must be in writing and will be considered as given on the day each is delivered by hand or deposited in the United States Mail to the address specified in this Agreement.

   **Severability.** If a court finds any provision of this Agreement, or any Related Document, to be invalid or unenforceable, the offending provision will be deemed to be modified to be within the limits of enforceability or validity. However, if this cannot be done, the offending provision will be deemed to be stricken and all other provisions of this Agreement will remain valid, enforceable and in effect.

**Joint and Several Liability; Successors and Assigns Bound.** Borrower (and each Borrower if there is more than one) and each Guarantor are obligated under this Agreement and under each Related Documents on a "joint and several" basis. Each and every covenant and obligation of this Agreement and under all Related Documents shall be binding upon Borrower (and each Borrower if there is more than one) and on each Guarantor, and shall be further binding on each of their successors, heirs, representatives and assigns. Borrower may not, however, assign its rights under this Agreement or under any Related Document without Lender's prior written consent.

**Unconditional and Irrevocable Nature of Agreements and Consents.** Borrower's and each Guarantor's covenants, agreements and consents under this Agreement and under each Related Document are unconditional and irrevocable, and may not be withdrawn or otherwise revoked by Borrower or by any Guarantor under any circumstance, other than as a result of Lender's prior written consent, which Lender has the right to reject or withhold for any or no reason.

**Sole Discretion of Lender.** Whenever Lender's consent or approval is required under this Agreement or under any Related Document, Lender's decision whether to consent or approve will be in the sole and exclusive discretion of Lender, and Lender's decision will be final and conclusive.

**No Waiver of Rights.** Lender will not be deemed to waive any right or remedy under this Agreement or under any Related Document unless the waiver is in writing and signed

by Lender. No delay or omission on the part of Lender in exercising any right or remedy may be construed by Borrower, or by Borrower's owners, principals or management officials, or by any Guarantor, or by any court of law or in arbitration, as a waiver or forbearance of any such right or remedy or of any other right or remedy that may be available to Lender. Lender's written waiver of a provision of this Agreement or any Related Document will not prejudice, and may not in any way be construed as a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement or any Related Document. No course of dealing between Lender and Borrower, or between Lender and any Guarantor, may be constituted as a waiver of any of Lender's rights or remedy, or of any obligation of Borrower or any Guarantor.

**JURY WAIVER.** Lender, Borrower and each Guarantor waive the right to trial by jury in any lawsuit brought by any party against any other party.

**CONSENT TO JURISDICTION AND VENUE.** In the event that Borrower or any Guarantor should ever assert a litigious claim or counterclaim against Lender for any reason related to this Agreement or any Related Document, Borrower and each Guarantor unconditionally agree to assert such a claim in the form of a lawsuit or in arbitration commenced in a state or federal court located in the state in which a plurality of the Borrowers have their principal place of business, with Borrower and each Guarantor hereby consenting to the jurisdiction and venue of such courts for such purposes.

**EACH BORROWER AND EACH GUARANTOR CERTIFY THAT: (1) THEY HAVE AGREED TO BE SUBJECT TO THIS AGREEMENT AND EACH RELATED DOCUMENT AS THEIR OWN FREE ACT AND DEED, WITHOUT DURESS OR COERCION; (2) THEY HAVE CONSULTED WITH AN ATTORNEY, OR HAD THE OPPORTUNITY TO DO SO; (3) THEY HAVE CAREFULLY READ THIS AGREEMENT AND EACH RELATED DOCUMENT, AND AGREE TO ALL THEIR TERMS AS WRITTEN; (4) THEY HAVE KNOWINGLY CONSENTED TO ALL WAIVERS; AND (5) NEITHER LENDER NOR ANYONE CONNECTED WITH LENDER HAS MADE ANY STATEMENT OR PROMISE THAT MAY CONTRADICT IN ANY WAY WHAT IS WRITTEN IN THIS AGREEMENT OR IN ANY RELATED DOCUMENT.**

| BORROWER | | BORROWER | |
|---|---|---|---|
| Suburban Dodge of Berwyn, Inc. | | Donald E. Jeffers | |
| ENTITY TYPE | STATE OF ORGANIZATION | ENTITY TYPE | STATE OF ORGANIZATION |
| Corporation | Illinois | Individual | Illinois |
| BY | | BY | |
| NAME | | NAME | |
| ADDRESS | | ADDRESS | |
| CITY | STATE | ZIP | CITY | STATE | ZIP |

| BORROWER | | BORROWER | |
|---|---|---|---|
| | | William Shea | |
| ENTITY TYPE | STATE OF ORGANIZATION | ENTITY TYPE | STATE OF ORGANIZATION |
| | | Individual | Illinois |
| BY | | BY | |
| NAME | | NAME | |
| ADDRESS | | ADDRESS | |
| CITY | STATE | ZIP | CITY | STATE | ZIP |

| LENDER | | ADDRESS | |
|---|---|---|---|
| DAIMLERCHRYSLER SERVICES NORTH AMERICA LLC | | | |
| ENTITY TYPE | STATE OF ORGANIZATION | CITY | STATE | ZIP |
| Limited Liability Company | Michigan | | |
| BY | | | |
| NAME | | | |

Recommended in Alabama, Alaska, Arizona, District of Columbia, Florida, Georgia, Indiana, Kansas, Minnesota, Missouri, Montana, New York, North Carolina, Oregon, Puerto Rico, South Carolina, Tennessee, Utah, West Virginia and Wyoming.

### NOTARIAL AFFIDAVIT

STATE OF _____   COUNTY OF _____

I, the undersigned Notary Public, hereby affirm that the above personally appeared before me and attested that he/she executed the foregoing Agreement as the proper and duly authorized representative(s) of Borrower(s).

SWORN TO AND SUBSCRIBED                     A Notary Public duly commissioned and qualified for the State

this _____ day of _____     of _____ County of _____

NAME _____           My commission expires: _____