ord-Final Cash Collateral Order v3 7-25-05

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re ) | Chapter 11 |
| ) | |
| SUBURBAN DODGE OF ) | Case No. 04 B 42931 |
| BERWYN, INC. D/B/A SUBURBAN ) | |
| DODGE-ISUZU-SUZUKI, AN ILLINOIS ) | Hon. Eugene R. Wedoff |
| CORPORATION, ) | |
| ) | Date: August 2, 2005 |
| Debtor. ) | Time: 10:00 a.m. |

## FINAL ORDER AUTHORIZING THE USE OF CASH COLLATERAL AND PROVIDING ADEQUATE PROTECTION UNDER 11 U.S.C. § 363(c) AND LIMITED POST-PETITION FINANCING UNDER 11 U.S.C. § 364

This matter is before the Court pursuant to the *Motion for Entry of Order Authorizing Use of Cash Collateral and Debtor in Possession Financing* (the "Motion") submitted by Suburban Dodge of Berwyn, Inc. d/b/a Suburban Dodge-Isuzu-Suzuki, debtor and debtor in possession ("Debtor"); and the Court having entered periodic Interim Orders with respect to the Motion during the pendency of this case (collectively, the "Interim Orders"); and a final hearing (the "Final Hearing") having been held by the Court on August 2, 2005 to consider the Motion; and the Court having considered the offers of proof and the statements of counsel at the Interim Hearing and at the Final Hearing; and it appearing to the Court that good cause appears therefore,

THE COURT HEREBY FINDS, UPON THE RECORD OF THE PROCEEDINGS HERETOFORE HELD BEFORE THE COURT WITH RESPECT TO THE MOTION, AS FOLLOWS:

A. Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code on November 18, 2004 (the "Petition Date"). Debtor is acting as a Debtor in Possession and no trustee has been appointed.

B.  DCSNA is a pre-petition creditor of Debtor holding a claim secured by Debtor's personal property, including without limitation all vehicle and parts inventory, furniture, fixtures and equipment, accounts receivable, general intangibles and the proceeds of all the foregoing (the "Collateral").

C.  This Court has jurisdiction to hear and determine the matter at bar pursuant to 28 U.S.C. §§ 157(b)(1), 157(b)(2)(M) and 1334, 11 U.S.C. § 363(e) and Fed. R. Bankr. P. 4001(d). This is a core proceeding.

D.  Debtor was an automobile dealership in the business of selling new and used vehicles and vehicle parts and accessories and providing repair and maintenance service.

E.  DCSNA provided wholesale floor plan financing to Debtor whereby DCSNA financed and Debtor acquired virtually all of its inventory of motor vehicles and parts. The wholesale floor plan financing was provided pursuant to various financing agreements including, without limitation, that certain Master Loan and Security Agreement dated February 8, 2002 (the "MLSA").

F.  DCSNA provided capital financing to Debtor whereby DCSNA provided funds for the operation of the Debtor's automobile dealership. The capital financing was provided pursuant to various financing agreements including that certain Capital Loan Addendum to Master Loan and Security Agreement dated February 8, 2002, and that certain Capital Note dated January 23, 2004, and that certain Addendum to Capital Note dated January 23, 2004 (collectively, the "Capital Loan Documents").

G.  The financing agreements, including, without limitation, the MLSA and the Capital Loan Documents, are referred to collectively herein as the "Loan and Security Documents". Under the terms of these Loan and Security Documents, DCSNA acquired a security interest in

the Collateral. True and accurate copies of the Loan and Security Documents are attached to the Motion. DCSNA perfected its security interest by making all appropriate filings with the Secretary of State of the State of Illinois. True and accurate copies of said financing statements are attached to the Motion.

H.  As of the Petition Date, Debtor owed DCSNA a total of $5,980,101.23, representing $4,429,166.23 for new motor vehicle financing; $722,185.00 in used motor vehicle financing; and $828,750.00 in capital financing (the "Dealership Indebtedness"). In addition, as of the Petition Date, DCSNA held a claim against Debtor in the amount of $2,744,313.55 for certain mortgage financing indebtedness incurred by Jeffers Properties, LLC, which has been guaranteed by Debtor (the "Guaranteed Indebtedness" and together with Dealership Indebtedness, the "Existing Indebtedness"). The Guaranteed Indebtedness is also secured by the Collateral.

I.  Without the continued use of DCSNA's cash collateral, Debtor was unable to continue operations. Debtor's financial condition was such that it was unable to continue to operate long-term as a going-concern. Pursuant to an order of this Court under 11 U.S.C. §363, on or about May 20, 2005, Debtor sold virtually all of its assets to an unrelated third party. Debtor no longer operates a business in the ordinary course.

J.  DCSNA permitted Debtor to use cash collateral, on a limited basis, upon certain terms and conditions, and upon the provision of adequate protection. Accordingly, Debtor and DCSNA established the basis upon which Debtor could:

    (i)  Use cash collateral of DCSNA;

    (ii)  Sell in the ordinary course of business certain inventory in which DCSNA held a perfected security interest;

(iii) Segregate, sequester and pay over to DCSNA the net proceeds of DCSNA's cash collateral;

(iv) Provide for adequate protection of DCSNA's security interest in the collateral utilized by the Debtor; and

(v) Establish a basis upon which Debtor might obtain post-petition wholesale financing from DCSNA.

K. The debtor stipulates that the claims of DCSNA for Existing Indebtedness are secured claims within the meaning of Section 506 of the Bankruptcy Code to the extent of principal, interest thereon at the rate set forth in the existing loan documents, costs, attorneys fees, and out-of-pocket expenses incurred and to be incurred by DCSNA in connection with this case.

**NOW, THEREFORE,** UPON THE RECORD OF THE PROCEEDINGS HERETOFORE HELD BEFORE THE COURT WITH RESPECT TO THE MOTION, THE EVIDENCE ADDUCED AT THE INTERIM HEARING AND THE FINAL HEARING, AND THE STATEMENTS OF COUNSEL THEREAT, IT IS HEREBY ORDERED THAT:

### Use of Cash Collateral

1. Subject to the terms and conditions of this Order, Debtor's use of cash and cash equivalents has been and is authorized pursuant to, and as defined by, 11 U.S.C. § 363, whenever acquired, in which the estate and an entity other than the estates have an interest, including the proceeds, products, offspring, rents or profits of property (hereafter "Cash Collateral"). **Notwithstanding the foregoing, except as otherwise agreed to by DCSNA in writing: (a) Debtor's use of cash collateral may not exceed the amounts set forth in the Budgets**

**attached to the Interim Orders, with Debtor's disbursements in each cost and expense category not to exceed the amounts set forth for such categories on the budgets; and (b) Debtor may use all funds on hand as of the entry of this order to pay for any expense incurred or to be incurred by Debtor subsequent to the Petition Date.**

2. The Debtor was and shall continue to be authorized to use DCSNA's cash collateral in the ordinary course of its business on the following terms and conditions:

    A.    RETAIL SALE OF MOTOR VEHICLES IN WHICH DCSNA RETAINS A SECURITY INTEREST

Upon the sale of a motor vehicle in which DCSNA retains a security interest, Debtor was authorized to use that portion of DCSNA's cash collateral which either (a) represents the difference between the amount of financing (*i.e.*, the amount shown as the current balance on DCSNA's statements to Debtor) and the amount for which the vehicle is sold by Debtor, or (b) if DCSNA has not provided any financing with respect to the motor vehicle, represents 20% of the amount for which the vehicle is sold by Debtor, net of salesmen's commissions, sales taxes and title expenses, subject in either event to the following terms and conditions:

    i.    All proceeds of the sale of a motor vehicle, including, but not limited to, any down payment, were to be placed into a DCSNA Vehicle Cash Collateral Account (the "Account") established by the Debtor. Said Account was established at a Bank with which Debtor had no banking relationship or borrowing

relationship. Debtor was, and continues to be required provide an accounting to DCSNA with regard to said Account upon demand by DCSNA.

  ii. Within one (1) banking day of Debtor's receipt of proceeds from the sale of a vehicle, Debtor was required to either deliver to DCSNA's on-site representative or overnight mail to DCSNA's Midwest Business Center office located in Lisle, Illinois a cashier's check in an amount equal to (a) the amount financed on said vehicle, or (b) if no amount had been financed on said vehicle, 80% of the amount for which the vehicle was sold by Debtor, net of salesmen's commissions, sales taxes and title expenses. However, to the extent Debtor did not receive proceeds from the sale of the vehicle by the fourteenth (14th) banking day following the sale of said vehicle, Debtor was, required to deliver to DCSNA's on-site representative or overnight mail to the Midwest Business Center of DCSNA, a cashier's check in an amount equal to the amount due to DCSNA as set forth above. Only after DCSNA was paid the amount due to DCSNA as set forth herein, was Debtor authorized to withdraw its share of the proceeds from the sale of that particular vehicle from the Account.

  iii. If Debtor accepted a trade-in as part of the sale of such a vehicle, DCSNA was granted a lien pursuant to 11 U.S.C. § 364(c) and 11 U.S.C. § 507(b) on any such trade-in vehicle, and, at

DCSNA's option, DCSNA might finance any trade-in vehicle, if requested to do so by Debtor. Debtor was required to deliver the title to said trade-in vehicle to DCSNA prior to DCSNA financing.

  iv. If Debtor accepted a trade-in in total or partial consideration of the sale of such a vehicle, Debtor was, required to pay off any lien on the "trade-in vehicle" within two (2) business days of acceptance of the trade-in vehicle, and, within three (3) business days of payoff, submit proof to pay DCSNA that the lien on the trade-in vehicle was paid off.

  v. Debtor was prohibited from selling any vehicle for less than the financed amount without the prior written consent of DCSNA. If Debtor sold a floored vehicle for less than the financed amount, DCSNA was entitled to receive all proceeds of the sale, in kind, and Debtor was required, within two (2) banking days of the sale of such a vehicle, to pay DCSNA the difference between the amount financed on the vehicle and the proceeds of sale.

  vi. Without the prior written consent of DCSNA, Debtor was prohibited from giving a credit on a retail installment contract or a retail lease for a trade-in vehicle which credit exceeds the NADA Gold Book wholesale value of said vehicle or the value of any firm bid from a wholesaler on said trade-in vehicle, whichever is greater.

B. FLEET SALES, DEALER TRADES/SALES AND/OR AUTO BROKER SALES

With regard to fleet sales, dealer trades/sales and/or auto broker sales, Debtor was required to instruct the parties acquiring vehicles from Debtor to make payment by check or checks jointly payable to Debtor and DCSNA. Debtor was required to then endorse said checks and deliver said checks, in kind, to DCSNA. DCSNA was then required to issue a check to Debtor for Debtor's share of the proceeds of sale, if any. Debtor was prohibited from entering into any fleet sales or dealer trade/sales or auto broker sales without DCSNA's prior written consent.

C. WHOLESALE OR AUCTION SALES

Debtor was prohibited from "wholesaling" or selling at auction any motor vehicles, including but not limited to, motor vehicles on which DCSNA had a lien, without DCSNA's prior express written consent. However, Debtor was authorized to sell trade-in vehicles received by Debtor in connection with post-petition vehicle sales, at auction or through a wholesaler, provided that DCSNA had not made a specific advance in connection said vehicles and provided that Debtor complied with the following portions of this paragraph. In the event Debtor elected to sell vehicles on a wholesale basis or at auction, with DCSNA's consent, Debtor was obligated to instruct the parties acquiring the vehicles from Debtor to make payment by check or checks jointly payable to Debtor and DCSNA. Debtor was required to then endorse said checks and deliver said checks, in kind, to DCSNA and DCSNA was required to then issue a check to

Debtor for Debtor's share of the proceeds of sale, if any, after satisfaction of DCSNA's liens on said vehicles as provided in paragraph 2(A) above, and after cure of any defaults to DCSNA, if any defaults existed.

D.     FINANCING OF VEHICLES IN WHICH DCSNA DOES NOT RETAIN AN EXISTING INTEREST

At DCSNA's option, DCSNA had the discretion to advance funds to Debtor and secure said advances by taking a security interest in any new or used vehicles in which DCSNA did not retain an existing security interest. Upon the sale of a vehicle securing said advance, Debtor was, required to pay DCSNA as provided in paragraph 2(A) above. With regard to all such advances by DCSNA, Debtor was required to execute a standard DCSNA form Note and Security Agreement, and deliver the original title (pink slip) to DCSNA.

E.     SALE OF AUTOMOTIVE PARTS

Upon the sale of automotive parts, Debtor was authorized to use that portion of DCSNA's cash collateral representing the difference between the sales price of said parts and the wholesale cost of the parts, on the following terms and conditions:

      i.     Debtor was required to provide DCSNA with an inventory of all of Debtor's automotive parts. As automotive parts were sold over the counter or sold in connection with Debtor's service or repair of customers' motor vehicles, Debtor was required to maintain a ledger, setting forth, with regard to each part, the date sold, a description of the part, and the wholesale cost of the part.

  ii. Each Friday on a weekly basis, Debtor was required to pay to DCSNA, in the form of a cashier's check, an amount equal to the wholesale cost of all of said automotive parts sold for the previous seven-day period, less the cost of any replenishment of parts inventory which was physically received by Debtor during the prior seven-day period, and which were free and clear of any liens or encumbrances.

  iii. Each Friday, Debtor was required to deliver a copy of its parts ledger, showing parts sold during the previous seven days, along with Debtor's cashier's check in payment of all parts sold and not replaced.

  iv. Debtor was prohibited from selling any automotive parts in bulk, or on a wholesale basis, without DCSNA's prior written consent. If automotive parts were sold in bulk, or on a wholesale basis, Debtor was required to instruct purchasers to make payment in the form of a check payable to DCSNA and Debtor. Within two (2) banking days of receipt of proceeds of such a sale by Debtor, Debtor was required to endorse and deliver said proceeds check to DCSNA for collection and upon collection of the check, DCSNA was required to issue its check to Debtor for an amount equal to the sale price of the parts, less the wholesale acquisition cost of the parts by Debtor.

F. CHATTEL PAPER

  DCSNA's purchase of chattel paper from Debtor was governed by the pre-petition agreements between DCSNA and Debtor.

### General Provisions

3.  As adequate protection for the diminution in value of DCSNA's collateral as of the Petition Date, as a result of Debtor's use of Cash Collateral used by Debtor hereunder in which DCSNA has an interest, DCSNA was and hereby is granted (i) liens and security interests in all post-petition assets of Debtor, (ii) liens and security interests junior to properly perfected liens and security interests in all pre-petition assets of the Debtor, and (iii) claims entitled to priority over any and all administrative expense claims of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code except that such claim shall be subject to all costs and expenses permitted under 28 U.S.C. § 1930. Said liens and security interests shall be valid, perfected, enforceable and effective as of the Petition Date without any further action by Debtor or DCSNA, and without the execution, filing and recording of any documents evidencing the same which may otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to DCSNA in this order.

4.  Debtor and its principals are prohibited from filing or allowing to be filed a Motion under section 364(d) of the Bankruptcy Code or other applicable law, seeking the obtaining of credit or incurring of debt secured by a senior or equal lien on DCSNA's collateral.

5.  DCSNA was, and continues to be, authorized to conduct physical and book audits of Debtor's operation at any time; Debtor was required to allow DCSNA personnel to be on the premises at all reasonable times and allow DCSNA personnel full reasonable access to all dealership computers, books and records, including, but not limited to, all reports of sale books, cash entry journals, deal jackets, and all banking records. DCSNA was authorized to maintain a

"keeper" at the Debtor's location to, among other things, prevent out-of-trust disposition of DCSNA's Collateral, to monitor DCSNA's Collateral, and to collect proceeds, in kind.

6.  Debtor was and continues to be required to provide DCSNA and counsel for DCSNA with copies of all financial and operating reports provided to the U.S. Trustee, at or about the time said reports are provided to the U.S. Trustee, and all regular financial statements prepared in the ordinary course of Debtor's business.

## Use of Proceeds of Suzuki Vehicle

7.  One of the vehicles that was financed by DCSNA is a 2004 Suzuki Verona VIN KL5VM52L54B111058 (the "Suzuki Vehicle"). As of the Petition Date, the Suzuki Vehicle was in the possession of Perfection Auto. Notwithstanding the provisions of paragraph 2 above, Debtor may use the proceeds of any sale of the Suzuki Vehicle or any recovery from Perfection Auto to pay for any expense incurred or to be incurred by Debtor subsequent to the Petition Date.

## Default and Remedies Upon Default

8.  Debtor shall be deemed to be in default hereunder if Debtor fails to comply with any of the terms and conditions set forth in paragraphs 1 through 7, above.

9.  In the event of any default hereunder, counsel for DCSNA shall notify, via fax, counsel for Debtor, at (312) 939-1742, of the default;

   a.  If said default is not cured within one (1) day after said Notice Debtor's use of cash collateral shall be suspended forthwith; and

   b.  **If said default is not cured within three (3) business days after said Notice, DCSNA may file and serve Debtor and counsel for Debtor, via fax, with a Declaration of Default. Debtor shall have three (3) business days from the date counsel for Debtor is served, via fax, with the Declaration of**

Default, in which to file and serve counsel for DCSNA, via fax, with a Declaration to the effect that Debtor was not in default or that Debtor cured the default within three (3) days of service of Notice of Default. Said Declaration shall include documentary evidence, establishing or tending to establish that Debtor was not in default, or that Debtor cured the default within three (3) days of service of the Notice of Default. Upon failure of Debtor to comply with any of the foregoing provisions of this paragraph 9, DCSNA may seek a hearing for relief from the automatic stay on twenty-four (24) hour notice.

**Stipulated and Agreed to by:**

| | |
|---|---|
| **Suburban Dodge of Berwyn, Inc. d/b/a Suburban Dodge-Isuzu-Suzuki** | **DaimlerChrysler Services North America LLC** |
| *(signature)* | *(signature)* |
| One of its Attorneys | One of its Attorneys |
| Michael L. Gesas, #06186924<br>David A. Golin, #06180517<br>dgolin@gpgglaw.com<br>Gesas, Pilati, Gesas & Golin, Ltd.<br>53 W. Jackson Blvd., #528<br>Chicago, IL 60604<br>(312) 726-3100<br>(312) 427-6666 (fax)<br><br>Attorneys for Suburban Dodge of Berwyn, Inc. d/b/a Suburban Dodge-Isuzu-Suzuki, debtor and debtor in possession | Barry A. Chatz, #06196639<br>bachatz@arnstein.com<br>Arnstein & Lehr<br>120 S. Riverside Plaza, Suite 1200<br>Chicago, IL 60606<br>(312) 876-6670<br>(312) 876-0228 (fax)<br><br>Francis X. Buckley, Jr., #06185143<br>Mark V. Bossi, #06197380<br>mbossi@thompsoncoburn.com<br>Brian W. Hockett, #06281854<br>bhockett@thompsoncoburn.com<br>Thompson Coburn LLP<br>One U.S. Bank Plaza<br>St. Louis, MO 63101<br>(314) 552-6000<br>(314) 552-7015 (fax) |

Attorneys for DaimlerChrysler Services
North America LLC

**It is so Ordered.**

Dated:     AUG 0 2 2005

Hon. Eugene R. Wedoff
United States Bankruptcy Judge

- 14 -